## MARGARETHA AHNEFELD v. WABASH RAILROAD COMPANY, Appellant.

Division Two, May 19, 1908.

1. **NEGLIGENCE: Pedestrian on Track: Lookout: Statute: Trespassers.**  It is the duty of those in charge of a railroad train to keep a lookout for pedestrians on the track wherever there has been such use of the track as a passway or footpath by the public as to afford reasonable ground to the operatives of the train to expect or anticipate the presence of persons on the track.  Nor does the statute (Sec. 1105, R. S. 1899), which declares that persons who walk upon the track are to be deemed trespassers in any action brought on account of their injury, lessen their duty or impair the rule.

Ahnefeld v. Railroad.

2. ————: ————: ————: **Licensees or Trespassers.** It is immaterial whether pedestrians on a railroad track at a point where those in charge of a train might reasonably, because of long use of the track by the public as a footpath, be expected to anticipate their presence there, be denominated licensees or trespassers. Whether they be the one or the other, the duty is still upon the train operatives to keep a lookout for them, and in some way—by ringing the bell, sounding the whistle or otherwise—to warn them of the approach of the train.

3. ————: ————: ————: **Evidence of Long Use: Statute.** Notwithstanding the statute (Sec. 1105, R. S. 1899) says that one who walks on a railroad track, except at crossings, etc., and shall receive harm on account thereof, shall be deemed to have committed a trespass, it is not error to admit in evidence testimony tending to show that the track at the point where the pedestrian was injured was habitually used by the public with the tacit consent and acquiescence of the railroad company. The statute does not mean that persons who go upon a railroad track at points other than crossings or a public road, are conclusively deemed to be guilty of trespass. It does not mean that no state of facts can serve to qualify the right of the railroad company to invoke it. It does not mean that the company owes no duty even to trespassers to look out for them.

4. ————: ————: ————: ————: **Qualification of Defense: Acquiescence.** The statute cannot be invoked to bar a recovery for injury to a pedestrian on the track at a point, where, because of a long, continuous use of the track by the public generally, the railroad company should expect them to be; on the contrary, if the railroad company consented and acquiesced in the use of its track by the general public at any point along its line, and permitted the open, known, free, continuous and extensive use thereof by footmen, such conduct on its part is to be construed as amounting to an invitation by it to the public to use its track as a footway, and as a qualification of its right to invoke the provisions of the statute when it is shown to have failed to keep a lookout or to give warning to persons who were on the track.

5. ————: ————: **Acquiescence in Trespass: Invocation of Statute.** It is not consonant with sound legal principles to permit a railroad to acquiesce for a long time in a trespass upon its road, and then when sued for an injury to the trespasser permit it to invoke the statute against trespassing upon the railroad as a defense, and plead that it owed the trespasser no duty to lookout for him or to use ordinary care not to injure him.

6. ————: ————. Instructions similar to those given in the Morgan and Eppstein cases are approved.

7. ———: ———: **Pleading: User by Consent.** A petition which charges, "And which for many years pedestrians to and from the said town of Carrollton and the said station and depot at said town of Carrollton, had been accustomed to use as a road or footpath by the forbearance and tacit consent of defendant," is *held,* when assailed by a motion in arrest, to sufficiently charge user of the track by the public by the consent of defendant.

Appeal from Carroll Circuit Court.—*Hon. John P. Butler,* Judge.

AFFIRMED.

*James L. Minnis* for appellant; *Jones & Conkling* of counsel.

(1) The law conclusively presumes for the purposes of this action that deceased was a trespasser and therefore the court committed error in admitting evidence over defendant's objection tending to show that he was a bare licensee. R. S. 1899, sec. 1105; Ryan v. Railroad, 88 Mo. 392; Barker v. Railroad, 98 Mo. 50; Hyde v. Railroad, 110 Mo. 272. (2) As deceased must be conclusively presumed to have been a trespasser, defendant was not bound to look out for him, and therefore the demurrer to plaintiff's evidence should have been sustained. R. S. 1899, sec. 1105; Sullivan on Statutory Construction, p. 331, sec. 253, p. 373, sec. 289; Beach on Contr. Negligence (3 Ed.), sec. 203; 3 Elliott on Railroads (1 Ed.), p. 1956, sec. 1253, and pp. 1960 and 1961, sec. 1254; 2 Thompson on Negligence, secs. 1706 and 1711; Ryan v. Railroad, 88 Mo. 392; Barker v. Railroad, 98 Mo. 50; Hyde v. Railroad, 110 Mo. 272; O'Donnell v. Railroad, 197 Mo. 113. (3) If section 1105 be disregarded, still the demurrer should have been sustained, because the deceased was a trespasser in fact, or, at best, a bare licensee, and therefore could not complain of the failure to keep a lookout for him. 2 Thompson on Negligence, sec. 1718; 3 Elliott on Railroads (2 Ed.), p.

1947, sec. 1248; Beach on Contributory Negligence, sec. 212; Carr v. Railroad, 195 Mo. 297; Chaney v. Railroad, 176 Mo. 598; Wenker v. Railroad, 169 Mo. 592; Feeback v. Railroad, 167 Mo. 206; Berry v. Railroad, 124 Mo. 223; Frye v. Railroad, 200 Mo. 377; Railroad v. Womack, 84 Ala. 149. (4) The demurrer should have been sustained, because under the peculiar facts in this case the failure of the engineer to look out for deceased was not negligence, even if it be conceded that it would have been his duty under ordinary circumstances to have kept a lookout. Boyd v. Railroad, 105 Mo. 371. (5) The demurrer should have been sustained, because the gross negligence of deceased, under the peculiar circumstances, was the sole cause of his injury and death. Carrier v. Railroad, 175 Mo. 470; Holwerson v. Railroad, 157 Mo. 243. (6) Defendant's motion in arrest of judgment should have been sustained. Frye v. Railroad, 200 Mo. 377.

*Lozier, Morris & Atwood* for respondent.

(1) A demurrer to the evidence admits every fact which any of the evidence tends to prove, and also every fact which the jurors might, with propriety, infer from the facts before them, and should be allowed only when the evidence, thus considered, wholly fails to make proof of some essential averment. Noenger v. Vogt, 88 Mo. 592; Wilson v. Board of Education, 63 Mo. 140; Kelly v. Railroad, 70 Mo. 608; Frick v. Railroad, 75 Mo. 609; Fearons v. Railroad, 180 Mo. 220. (2) The court did not err in overruling the demurrer to plaintiff's evidence, as there was ample evidence tending to show actionable negligence on the part of defendant; hence, the case was properly submitted to the jury. Fearons v. Railroad, 180 Mo. 208; Morgan v. Railroad, 159 Mo. 262; Eppstein v. Railroad, 197 Mo. 720; Frye v. Railroad, 200 Mo. 401; Scullin v. Railroad, 184 Mo. 705; Chamberlain v. Rail-

road, 133 Mo. 587; Williams v. Railroad, 96 Mo. 275; Guenther v. Railroad, 95 Mo. 286; Guenther v. Railroad, 108 Mo. 18; Fiedler v. Railroad, 107 Mo. 645; LeMay v. Railroad, 105 Mo. 361; Lynch v. Railroad, 111 Mo. 601; Murrell v. Railroad, 105 Mo. App. 88; Kreis v. Railroad, 131 Mo. 533; Harlan v. Railroad, 65 Mo. 24; Frick v. Railroad, 75 Mo. 595; O'Mellia v. Railroad, 115 Mo. 221; Scoville v. Railroad, 81 Mo. 483; Hicks v. Railroad, 64 Mo. 439; Ayers v. Railroad, 190 Mo. 238; Sites v. Knott, 179 Mo. 708. (3) The track of defendant, between the water tank and the cattle guards, having, with the knowledge of defendant and its employees, been habitually used for many years by a large number of pedestrians as a footpath, the employees of defendant in charge of the train knew that the presence of such persons in the switch yards and on its track might reasonably be expected; and it was therefore their duty to keep a careful lookout in order to discover such persons, and if they failed to do so, and if the death of Carl Ahnefeld resulted from such failure, they were guilty of actionable negligence. Fearons v. Railroad, 180 Mo. 208; Morgan v. Railroad, 159 Mo. 262; Eppstein v. Railroad, 197 Mo. 720; Frye v. Railroad, 200 Mo. 400; Scullin v. Railroad, 184 Mo. 705; Chamberlain v. Railroad, 133 Mo. 587; Williams v. Railroad, 96 Mo. 275; Guenther v. Railroad, 95 Mo. 286, 108 Mo. 18; Fiedler v. Railroad, 107 Mo. 645; LeMay v. Railroad, 105 Mo. 361; Lynch v. Railroad, 111 Mo. 601; Murrell v. Railroad, 105 Mo. App. 88; Kreis v. Railroad, 131 Mo. 533; Harlan v. Railroad, 65 Mo. 24; Frick v. Railroad, 75 Mo. 595; O'Mellia v. Railroad, 115 Mo. 221; Scoville v. Railroad, 81 Mo. 483; Hicks v. Railroad, 64 Mo. 440; Ayers v. Railroad, 190 Mo. 238; Sites v. Knott, 197 Mo. 708; Garner v. Trumbull, 94 Fed. 321; Ashworth v. Railroad, 116 Ga. 635; Railroad v. Schuster (Ky.), 7 S. W. 874; Railroad v. Smith, 87 Tex. 348; Taylor v. Canal

Co., 113 Pa. St. 162; Railroad v. Rogers, 100 Va. 324; 2 Thompson on Neg. (2 Ed.), secs. 1725, 1711 and 1712. (4) It was a question for the jury to say whether the use of the track and switch yards was of such long standing, and of such a nature and extent, as to impose on the employees of defendant, on approaching the point of the catastrophe, the duty of anticipating the probable presence of persons on the track. Eppstein v. Railroad, 197 Mo. 734; Garner v. Trumbull, 94 Fed. 321; Railroad v. Lowell, 151 U. S. 209; Hansen v. Railroad, 105 Cal. 379. (5) Defendant's servants in charge of its trains, with the slightest care upon their part, and by looking ahead of them, could have seen deceased for one-fourth of a mile before he was struck, and in view of the dangerous instrumentality which they were handling, and the long-continued practice of people to walk on said track, they should have been on the lookout; and had they looked, they would have seen that deceased was oblivious of the approach of defendant's train from the west, and that some warning or signal was necessary in his perilous situation. Defendant's servants wholly failed to sound the whistle, or ring the bell, or give him any warning whatever, and in this there was culpable negligence. Eppstein v. Railroad, 200 Mo. 720; Morgan v. Railroad, 159 Mo. 262; Chamberlain v. Railroad, 133 Mo. 587; Scullin v. Railroad, 184 Mo. 705; Williams v. Railroad, 96 Mo. 275; Guenther v. Railroad, 95 Mo. 286, 108 Mo. 18; Fiedler v. Railroad, 107 Mo. 645; LeMay v. Railroad, 105 Mo. 361. (6) The evidence tended to show that the engineer saw Carl Ahnefeld in ample time to have warned him, and to have saved his life, by the exercise of ordinary care, and that he failed to do it. This failure was actionable negligence on the part of defendant, regardless of whether defendant's track had been habitually used as a footpath by the public. Eppstein v. Railroad, 197 Mo. 72. (7) The

negligence of deceased does not bar plaintiff's right to recover, under the facts of this case. Kellny v. Railroad, 101 Mo. 74; Morgan v. Railroad, 159 Mo. 275; Eppstein v. Railroad, 197 Mo. 737; Sites v. Knott, 197 Mo. 708. (8) Though deceased was hard of hearing, it was defendant's duty to give him the same signals that it is required to give to a person in the possession, in an ordinary degree, of the sense of hearing, so that deceased might have such chance as his infirmity has left him of hearing and being saved. Railroad v. Cooper, 6 Am. and Eng. R. R. Cas. 5; Morgan v. Railroad, 159 Mo. 262; Poole v. Railroad, 53 N. C. 340; Railroad v. Triplett, 38 Ill. 482; Railroad v. Murphy, 17 O. C. C. 223; Railroad v. Stroud, 64 Miss. 784; Railroad v. Cook, 60 N. W. 899; Railroad v. Hanna, 79 S. W. 639; Campbell v. Railroad, 40 Pac. 997; Thompson v. Railroad, 40 L. R. A. 172; Lortz v. Railroad, 40 N. Y. Supp. 253; 2 Thompson on Neg., sec. 1782.

FOX, P. J.—This suit was instituted by plaintiff in the circuit court of Carroll county to recover $5,000, under the second section of the Damage Act, for the death of her husband, Carl Ahnefeld, who was struck and killed by a work train on defendant's railroad, near Carrollton, Missouri, on the 18th day of June, 1904. From a judgment in favor of plaintiff, defendant appeals.

The amended petition alleged that deceased at the time he was killed was walking in an easterly direction on defendant's track, within its switch limits, at about one-quarter of a mile east of its depot at Carrollton; that the track at the point of the accident, and for a long distance in either direction, was level and practically straight, "which was uninclosed and which for many years pedestrians to and from the said town of Carrollton and the said station and depot of de-

fendant at said town of Carrollton, had been accustomed to use as a road or footpath by the forbearance and tacit consent of the defendant;" that deceased was unaware of the near and dangerous approach of said train, and that defendant's agents and servants in charge of the train negligently failed to either ring the bell, sound the whistle or give any other signal by which plaintiff's husband might be warned of the near and dangerous approach of said train, and that defendant's agents and servants in charge of the train either saw deceased in peril, or could have seen him in peril had they been on the lookout for him, in time to have averted his death, but neglected to do so.

The answer, after admitting the incorporation of the defendant, and that plaintiff was the widow of the deceased, and denying the other allegations of the petition, charged that the death of the deceased, who was not connected with or employed upon the railroad, was solely the result of his own negligence in walking on the track of the defendant at a point where the same was not laid upon or along a publicly traveled road or street, or over a highway crossing, without looking and listening for the approach of trains, in violation of section 1105 of the Revised Statutes of Missouri.

The reply denied generally the new matter contained in the answer.

The facts developed at the trial on behalf of the plaintiff, were substantially as follows:

The defendant's depot is located about a mile and a half south of the business part of Carrollton and about a half mile south of the south limits of that corporation. The main track of the railroad runs in an easterly and westerly direction and along the south side of the depot. A switch or side track leads off from the main track at a point about one-quarter of a mile east of the depot, and extends westward to and along the north side of the depot, and beyond to a connec-

tion with the main track.   The distance between this side track and the main track where they cross the Rock Road hereafter referred to, is about fifty feet. This siding defined the north boundary of defendant's switch yard.   A similar siding south of the main track formed the south boundary.   The water tank stood near the north side of the main track about two hundred feet east of the depot.   What is called the Rock or Avenue road, which extends directly south from Carrollton, passed over the station grounds between the depot and water tank at about equal distance from each other.   A small building used as a grain or coal office stood about sixty feet immediately north of the water tank, just north of the north side of the track, and about twenty-five or fifty feet east of the Rock road.   About sixty feet east of this grain or coal office a grain elevator was located on the same side track. About one hundred feet north of the north siding a road running east and west intersected the Rock or Avenue road.   Bode's store was on the corner, being immediately north of the east-and-west road, and immediately east of the Rock or Avenue road.   Some racks for hitching horses stood on the south side of the east-and-west road, a short distance southeast of the store. Along these two roads and north of defendant's right of way, about twenty-five buildings were located, forming a kind of a village, which the witnesses called South Carrollton.   The switch yard was not fenced, but the right of way extending east from the switch yard was inclosed by a fence and cattle-guards.

Deceased was a farmer who resided three or four miles west from defendant's depot; his age was estimated by one witness as being about fifty years.   On the day of the accident a primary election was being held in the little building which was used as a grain or coal office.   The accident occurred about two o'clock in the afternoon.   The movements of deceased and the

train were described by plaintiff's witnesses as follows: |

Witness Phil Huff testified: "I saw Carl Ahnefeld that day. I saw him as he came riding up on the north side of this office; he rode up kind o' on the north side and a little east, where the hitch rack was. I afterwards looked out the window on the south and saw him going around the elevator, going in a southeast direction at the time, on the railroad track. Shortly after he passed the office, I saw a train standing at the depot. It was a train of flat cars; the engine was reversed; the tender was headed east; it was a large engine and had a large tender, a high tender. I think it was known as a work train or extra. I did not hear any signals if any were given."

Witness Ed Ferguson testified: "Saw Mr. Ahnfeld that day; he rode up there and I seen him as he went away out to the railroad track. Last time I saw him he was going south right close by the end of the bridge bearing down east a little bit to the railroad. Shortly after that I saw a train on the defendant's track; I think when I noticed it it was just pulling out up to the tank; when it pulled out they went east. The train was made up of flat cars, as I recall it. The tender was going in front of the engine; looked to me like it was a pretty good-sized tender. The engineer was on his box, but I couldn't say that I seen the fireman. Couldn't tell whether I noticed any coal in the tender or not. If any signal was given, any whistle blown, or bell rung when the engine pulled out from the tank, or between the guards and the tank, I didn't hear it."

Witness Charles Gorman testified: "I saw him ride up and come from the west and across the road running north and south there; saw him ride up to the hitch rack; the next I saw of him he was going

towards the track, going south; he went, I judge, little east. The last I saw him alive he was just south of this office, going towards the railroad track. 'Q. State whether or not, after that, there was a train pulled into the depot from the west? A. Yes, about the same time a train pulled in there, is my recollection. There wasn't much difference in the time the train pulled in and he left.' Don't recollect hearing any signals when train pulled out."

The train remained at the water tank but a short while, and the engine, after taking water, pulled eastward down the track with its train. The track was level and practically straight. There were no obstructions of any kind between the water tank and the cattle-guards at the east end of the switch-yards. The deceased walked in an easterly direction to a point about two and one-half rail-lengths west of the cattle-guard at the east end of the switch-yard, where he was struck by the engine and killed while between the rails of the main track.

Witness Martha Rickert testified that she was standing at her front gate north of the switch-yard and about one-eighth of a mile east of the depot, or about half way between the depot and the cattle-guards at the east end of the switch. "I saw the man before he was killed; I saw him going down between the two tracks, between the side track and the main track. When I first saw him he was about one hundred yards from our house up the track. He was west of my house; he was in between the two tracks, walking on the plain level place between the two tracks. He was just walking along the same as any man would be walking along, and looked back a time or two, that was all. There was a work train or ballast train taking water at the tank. 'Q. When you saw him looking back, that was when, with reference to the time the train pulled out, before or after? A. He never

looked back after the train pulled out. He got on the main track east of my house. I noticed the train after it passed my house going east; I just saw the train going close on the man; I saw it would kill him anyhow and I just turned my back to keep from seeing him killed. That is all I did see. I did not hear any signals sounded nor bells rung; I don't think any was given. I was just about sixty yards from the track, or seventy, anyhow. The train did not make any halt. I looked around afterwards and the train was going on down the track. When I turned my back the train was not over five feet from him. I watched him as he went down; he kept looking back, and after he got past me he never looked back. Q. The train was in plain view? A. It was taking water.'" This witness further testified that as the train proceeded eastward the engineer had his head and shoulders out of the cab window on the north side of the engine, but did not know whether he was looking up or down the track, or in what direction he was looking.

Witness Trigg, who was about a quarter of a mile east of the east end of the switch limits at the time of the accident, testified: "Well, I and my son were coming up into town and we got to this place mentioned where the dike was and saw the train strike the old man. He pitched backwards and forwards; that was the last I seen of him. 'Q. How long before the train struck him did you see him? A. Oh, I suppose a minute.' The old gentleman was walking on the track going east and the train was following him. He was walking leisurely along. His face was facing east. The train was approaching east. I should judge, to the best of my recollection, I saw him about a minute, or such matter, before the train struck him. When I first saw him he was right in the center of the main line, and I did not observe anyone stationed on the lookout or front of the engine as it approached Mr.

Ahnefeld. When the train struck the old man it just kept going on. No whistle or bell was rung as they approached him. No signal of any kind was given. The train did not slacken its speed either before or after it struck him. My son motioned and tried to call them down; he made the signal to the engineer or fireman. The engineer shook his head and laughed."

Witness Henry Vogelsmeyer testified that he was well acquainted with deceased and that he was hard of hearing in both ears. "Had to talk loud to him to hear you, and if you didn't talk loud he couldn't hear; you have to talk pretty loud to talk with him." "Q. But you could carry on a conversation with him? A. Well, yes, for a little bit."

Witness Bode, referring to plaintiff, testified: "The widow called to see me a short time after the accident and wanted me to show her where it occurred. She said she had warned him not to walk on the track that day on account of his defective hearing."

Plaintiff offered a number of witnesses who testified, over defendant's objection, that persons residing in the neighborhood east of the depot had for many years walked along defendant's roadbed and track at the place of the accident in going to and returning from Carrollton; such use of defendant's track at the place in question had continued since 1868, the time the road was constructed; and that the roadbed and track of defendant for a number of years had been used by children attending school at Carrollton. Parties traveling east from the west generally entered the track at the water tank. On cross-examination these witnesses testified that in order to get on the track beyond the switch-yard it was necessary to get in at the cattle-guard or climb over the fence, and that parties using the track entered at different places along the right of way. The evidence also tended to show that a large amount of business was transacted

at and about defendant's depot and switch-yards, and a large amount of freight was loaded and unloaded there.

At the close of plaintiff's testimony defendant requested an instruction in the nature of a demurrer to the evidence, which was by the court overruled, to which action of the court defendant excepted. The defendant declined to offer any evidence, and the cause being submitted to the jury on the evidence adduced by plaintiff and the instructions of the court, they returned a verdict for the plaintiff, assessing her damages at the sum of $5,000.

Timely motions for new trial and in arrest of judgment were filed and by the court overruled. Judgment being entered in conformity to the verdict, defendant prosecutes its appeal to this court, and the record is now before us for review.

## OPINION.

The errors complained of by appellant, as disclosed by the record before us, are few, and may thus be briefly stated:

1st. That the court committed error in failing to give the instruction at the close of the evidence in the nature of a demurrer, directing the jury to find the issues for the defendant.

2d. That instructions numbered 2, 3 and 4 given by the court in behalf of plaintiff did not properly declare the law.

3d. That the trial court committed error in overruling the motion in arrest of judgment.

## I.

Referring to the first assignment of error, that is, that the court erroneously refused the request of the defendant telling the jury that plaintiff under the

pleadings and evidence was not entitled to recover, our attention is directed to the provisions of section 1105, Revised Statutes 1899, which provides: "If any person not connected with or employed upon the railroad shall walk upon the track or tracks thereof, except where the same shall be laid across or along a publicly-traveled road or street, or at any crossing, as hereinbefore provided, and shall receive harm on account thereof, such person shall be deemed to have committed a trespass in so walking upon said track in any action brought by him on account of such harm against the corporation owning such railroad, but not otherwise."

Upon the provisions of this section learned counsel for appellant has predicated a very strong and ingenious argument why the trial court should not have during the progress of the trial admitted in evidence the testimony tending to show that the track of defendant at the point where plaintiff's husband was killed was habitually used by the public with the tacit consent of the defendant, and why the court should have at the close of the evidence directed the jury to find the issues for the defendant.

It is insisted by counsel for appellant that the provisions of the section of the statute above quoted furnish a basis upon which may be predicated a legal and conclusive presumption, and it is very ably argued, that the person receiving harm under the circumstances mentioned in the statute may not in fact have committed a trespass in walking on the track, but according to the statute he will be conclusively presumed or deemed to have committed one, in any action brought by him on account of such harm. In other words, it is insisted that the person who receives harm while walking on the track on the private right of way of the company will be deemed or conclusively presumed to

have committed trespass in so walking on the track in any action brought on account of such harm.

The facts developed upon the trial of this cause and upon which the court submitted the cause to the jury are undisputed. The place at and near which plaintiff's husband was killed by the train of cars being operated by the servants of the defendant, for more than a quarter of a century had been habitually and continuously used daily by pedestrians as a footway and by the general public in receiving and delivering freights, and such use by the public was open, notorious and presumptively, at least, well known to and acquiesced in by the defendant. In fact it is conceded in the brief of counsel for the appellant that "the evidence shows that footmen habitually walked upon the track at the place in question since 1868, the time the road was constructed." However, with perfect fairness to appellant's counsel, it is well to state in making such admission he adds "and that during all that time not a single person had been injured by a train." The evidence introduced by plaintiff also clearly shows that the track at the point where plaintiff's husband was killed was straight and unobstructed for quite a distance, and there is no dispute that, if the defendant's employees operating the train had been on the lookout for any person who might be upon the track, they could have seen plaintiff's husband in ample time, had they exercised ordinary care, to have avoided running against him with such train and killing him. The evidence also shows, in fact it is not disputed, that the defendant's employees did not ring the engine bell, sound the engine whistle or give any danger signal to warn deceased of the approach of the train. It may further be added that there is an entire absence from the record before us of any disclosures that the railway company, the defendant, warned the public or protested in any way with the people generally or

the school children who were in the habit of walking on said track, against the use of such track in the manner in which they were using it, as a footpath or passway, and no notice was posted anywhere about the switch grounds notifying the public that they were prohibited from using the track as a footpath or passway in the manner they had been using it for so many years. Upon this state of facts it is earnestly contended by counsel for appellant that there was no case for the jury and in fact that the court should have excluded all the evidence showing the use of the track at or near the point where plaintiff's husband was killed, by pedestrians, and this insistence is predicated upon the provisions of the section of the statute heretofore quoted.

Counsel for appellant, with great industry and diligent search, has collated in his brief about all the cases decided by this court in which similar legal propositions to those presented in the case at bar were disclosed by the record. In a very respectful way counsel for appellant suggest a reconsideration of the long line of cases in which the proposition confronting us in the case at bar was fully treated and disposed of. As a basis for the request of reconsideration, it is suggested that the statute upon which appellant's counsel now predicates his insistence, was never carefully or at least correctly considered and interpreted by this court. It is further suggested that the two divisions of this court have erroneously decided this proposition, and moreover that such divisions are not in harmony in announcing the rules applicable to the propositions now in hand, and counsel undertakes to point out the conflict between the two divisions of this court upon the proposition with which we are confronted in the case at bar.

With due respect and consideration for the learning and ability of counsel discussing the propositions

now before us, we are unable to agree with him upon the contentions urged upon this proposition. We shall not undertake to give expression in detail to our review of the cases to which our attention has been directed, for the reason that to do so would extend this opinion beyond a reasonable limit; however, it by no means follows that we have not fully considered the suggestions made by counsel for appellant and fully reviewed the cases pointed out in which this subject has been in judgment before this court. We must be content with announcing the result of our conclusions from a full and fair consideration of the cases to which our attention has been directed, rather than to encumber this opinion with pointing out in detail the reasons which furnish the basis for such conclusion. We are unable to agree to the insistence by counsel for appellant that there is a conflict between the two divisions of this court upon the announcement of the rules of law applicable to the legal propositions now under discussion. A careful review of the cases pointed out by counsel convinces us that there is no substantial conflict upon the controlling underlying principles announced in those cases. It must not be overlooked that the facts disclosed by the records in the cases to which our attention has been directed have many marked shades of difference, and in the discussion of those facts the phraseology employed may differ, but a careful examination of the cases will demonstrate that the controlling principle is correctly announced as applicable to the particular facts in each of the cases.

In dealing with business enterprises, the operation of which is necessarily attended with danger to human life, the law very properly manifests its high regard for the preservation of the citizen from injury by reason of the operation of such enterprises, and the rules of law applicable to the care and caution to be

exercised by operatives of railways, or any other business enterprise attended with danger, spring from the dangerous character of the business, and while we frankly concede that railway and other business enterprises, even though the operation of their business is attended with danger, should be fairly dealt with in the prosecution of their business, and no rules of law should be announced by the courts which would do them an injustice or would in any way materially interfere with the successful prosecution of their business, yet in our opinion nothing could be more humiliating to the many great commonwealths of this nation than the failure of their rules of law to demand, in the operation of a business attended with great danger to the life of a citizen, of the operatives of such business, whenever the person or life of an individual is in danger, the exercise of such reasonable care and caution as will avoid the infliction of injury.

As applicable to the operation of railways in this State we have carefully analyzed the rules announced in the cases to which our attention has been directed concerning the duties of the operatives where they have reasonable ground, at any point along the line of railway, to expect or anticipate the presence of persons so near the railroad track as to endanger them. In our opinion there is substantially no conflict in the cases, and the rules announced are proper, reasonable and just rules upon that subject. To hold otherwise, would, in our judgment, be an absolute abandonment of some of the fundamental purposes of government, that is, the preservation of human life and the pursuit of happiness. We see no valid legal reason for departing from the rules announced.

Our attention is particularly called to the employment of certain language in the different divisions of this court. It is pointed out that in Division No. 1 in Frye v. Railroad, 200 Mo. l. c. 400, the court used

this language: "It has been held that where the general public have been invited to use the track by the tacit consent and long acquiescence of a railroad company in permitting open, known, free, continuous and extensive use thereof by footmen, then it owes a duty to such footmen to use ordinary care to look out for them and ordinary care to protect them from being run down and maimed or killed." From this language learned counsel then draws this conclusion: "According to this doctrine, the engineer owes a duty to look out only for 'such footmen' as 'have been invited to use the track by the tacit consent and long acquiescence' of the railroad company." In other cases it is pointed out that the court treats persons who have been in the habit of using the track as licensees, and therefore are not trespassers. It is then pointed out that Division No. 2 announced the rule that even though parties be technically trespassers, yet if they were in the habit of using the footpath upon the right of way without objections on the part of the railroad company, and had been so using such footpath for a sufficient length of time to authorize the presumption of knowledge on the part of the railroad company that at that point it was being so used as a footpath, the rule requiring the operatives of trains to keep a lookout for persons on the track at such points would equally apply to such persons. Counsel then argues that this doctrine is in conflict with the doctrine announced by Division No. 1 in this: "According to the doctrine of Division No. 1, the engineer is in duty bound to look out for only invited licensees, or persons rightly on the track, while this doctrine enjoins on him the duty to be on the lookout for trespassers as well."

The fundamental error assumed by this argument is in overlooking the main fact upon which the principle is predicated, that is, where the public have been

in the habit of using the track of the railway company
as a passway or footpath for a sufficient length of
time to indicate the acquiescence of the company in
such use of its track and for such length of time as
would raise the presumption that the operatives had
notice that at that point the track was being so used.
It is immaterial as to how you denominate the persons
who use the track, whether it is said they were in-
vited by the railway company or whether it is said
they were licensees, or whether it was a habit and
custom to use the track, or whether you denominate
them as trespassers; the controlling fact is whether
there has been such use of the track as a passway
or footpath by the public as to afford reasonable
grounds to the operatives of the train upon such track
to expect or anticipate the presence of persons so near
the railroad track as to endanger them. A
careful consideration of all the cases to which
our attention has been directed and of which
counsel so earnestly complain, will clearly dem-
onstrate that in their last analysis the final con-
clusion is predicated and the rule announced upon the
main fact that the operatives of the railway company
at certain points along its railway had reasonable
grounds, by reason of the continuous use of the track
at that point by the public, to expect or anticipate the
presence of persons so near the railroad track at such
points as to endanger them; hence, followed the just,
fair and reasonable rule that under such circumstances
it would be the duty of the operatives to keep a look-
out for the presence of such persons and to use ordi-
nary care and caution in avoiding any injury to them.

In Fiedler v. Railroad, 107 Mo. 1. c. 651, it was
expressly ruled by this division of the court that if
the person killed was even a trespasser yet if at the
point where the person was killed, and at the hour that
the train passed at that point which caused the death, a

great many people were in the habit of walking on and
across the tracks, the operatives of the train would
not be justified in acting on the presumption that the
track was clear, but it was their duty to keep a look-
out at that point for such persons as might be walk-
ing on or across the tracks. Judge GANTT, speaking
for this court in that case, said: "That the girl was
a trespasser by the statute law of this State is clear,
but the evidence of the conductor and fireman of the
train is undisputed that, at the hour this train passed
this point, a great many people were in the habit of
walking on and across the tracks. It was a place where
the trainmen might expect to find pedestrians on the
track. . . . The statute prohibiting all persons
from walking on the tracks was enacted with the double
view to save the lives of the trespassers by warning
them of danger, and of preventing accidents, and les-
sening the danger to the passengers and trainmen
whose safety depends upon a clear and unobstructed
track." In announcing the final conclusion in that
case, he said: "The rule has been long settled in this
State that, when there is reason to apprehend that the
track may not be clear, notwithstanding the right of
the company to have it clear, the persons operating a
train cannot act on the presumption that the track is
clear without being responsible for the consequences."

To the same effect is the comparatively recent case
of Frye v. Railroad, 200 Mo. l. c. 400, where this rule
is again fully recognized. It was there said: "Where
the general public have been invited to use the track
by the tacit consent and long acquiescence of a railroad
company in permitting the open, known, free, continu-
ous, and extensive use thereof by footmen, then it owes
a duty to each footman to use ordinary care to look
out for him." It will be observed in that case that
the language employed construes the tacit consent and
long acquiescence of the railway company in permit-

ting the open, continuous and extensive use of its tracks by footmen, as an invitation to use such tracks. So it will be found in numerous other cases, that different phraseology is used in discussing the proposition, but in the final conclusion it is always predicated upon the main fact that the use of the railroad track at that point by the public had been of such a nature and character as to furnish a reasonable ground on the part of the operatives to expect or anticipate the presence of persons at that particular point, and such being the case it was made the duty of such operatives under the law, through its high regard for the preservation of human life, to keep a lookout for the persons whose presence was reasonably expected at that particular point on the line of railway.

We have no apologies to make for the rule announced by this division in Fearons v. Railroad, 180 Mo. l. c. 222-223. The rule was announced in that case in this language: "Whenever the motorman or engineer, in the operation of its cars, before reaching a point along the line of its railway, has reasonable grounds to expect or anticipate the presence of persons so near the railroad track as to endanger them, then the law, through its high regard for the preservation of human life, requires and demands such operatives to be on the alert, and keep a lookout for the realization of the anticipation or expected presence of the person. . . . And even though the persons be trespassers, it does not relieve those in charge of the moving cars from keeping a careful lookout for the persons so expected to be present at that point." The rule in that case as to being applicable to trespassers, was predicated upon the case of Fiedler v. Railroad, supra. The rule announced in both the Fiedler and Fearons cases has met the approval of both divisions of this court, as well as court In Banc.

To the same effect is the case of Eppstein v. Rail-

road, 197 Mo. l. c. 736.   That was a case in which
there was evidence tending to show the use of de-
fendant's railway tracks by the public for a sufficient
length of time to indicate its acquiescence in its use
as a passway, and this court In Banc in its final con-
clusion, said: "That this case should have been al-
lowed to go to the jury, we think is within the reason-
ing of many of our decisions, of which a sample must
suffice:   Morgan v. Railroad, 159 Mo. 262; Fearons
v. Railroad, 180 Mo. 208—where the cases are reviewed,
differentiated and applied.   See, also, the remarks of
GANTT, J., *arguendo,* in Scullin v. Railroad, 184 Mo.
l. c. 705 and 707."

We see no necessity for pursuing this subject
further.   In our opinion there is no principle which has
been in judgment before this court in which the final
conclusions announced have been more uniform and
harmonious than the one involved in the case at bar.
We repeat that, in the discussion of the facts disclosed
by the record in the respective cases, there may be
shades of difference in the language employed giving
expression to the views of the court, yet a careful
analysis of all the cases will indicate absolute har-
mony in the announcement of the principle predicated
upon the overshadowing fact disclosed by the record
in the respective cases that there was reasonable
ground for the operatives of the railway at the point
where the accident occurred, by reason of the continued
use of such railway track by the public, to expect or
anticipate the presence of persons at such point on
the line of railway.   It is sufficient to cite the cases
which have fully recognized this rule:   Morgan v. Rail-
road, 159 Mo. 262; Eppstein v. Railroad, 197 Mo. 720;
Frye v. Railroad, 200 Mo. l. c. 400-401; Chamberlain
v. Railroad, 133 Mo. 587; Fiedler v. Railroad, 107 Mo.
645; LeMay v. Railroad, 105 Mo. 361; Fearons v.
Railroad, 180 Mo. 208; Sites v. Knott, 197 Mo. l. c.

708; Garner v. Trumbull, 94 Fed. 321, and numerous other cases.

Complaint is made that both divisions of this court and court In Banc have failed in treating of the propositions involved in this case to carefully analyze and properly interpret the provisions of section 1105, Revised Statutes 1899. In the case at bar, in compliance with the earnest request of learned counsel for appellant, we have carefully analyzed the provisions of the statute invoked as a basis of defense in this action. In our opinion, the right to invoke the provisions of this statute must be determined by the facts and circumstances surrounding the particular case. In other words, we are unwilling to say that this statute is absolute and furnishes a conclusive presumption that persons who go upon a line of road at such points as are designated by the statute, are conclusively presumed to be guilty of trespass, and that no state of facts can serve to qualify the right of a railway company to invoke the provisions of that statute in defense of actions brought by persons who have been injured upon its line of road. There are numerous instances in which the provisions of this statute are peculiarly applicable, and this court has never failed to strictly apply them where the facts developed at the trial authorized the application of such provisions, notably the cases to which appellant directs our attention, Barker v. Railroad, 98 Mo. 50, and Rine v. Railroad, 88 Mo. 392. The facts developed in those cases brought them strictly within the purview of the provisions of the statute to which our attention has been called. But, as was ruled in the Morgan case, if the railroad company, as the evidence tended to prove in that case, for more than twenty-five years acquiesced in its tracks being used as a footpath by the whole community, it should not be permitted, if persons are injured by reason of the fact that the operatives of

the railroad failed to keep a lookout for the presence
of such persons that were reasonably expected to be
upon the track, to take refuge under the provisions of
the statute heretofore mentioned and simply say that
notwithstanding there was reasonable ground to ex-
pect persons on the track at that point, yet under the
provisions of the statute they were guilty of commit-
ting a trespass and should be held amenable as tres-
passers, and we owed them no duty to keep a lookout
for them. In other words, we have no hesitancy in
holding that if the railway company at any particular
point along the line of its road consented and acquiesced
in the use of its track by the general public, and per-
mitted the open, known, free, continuous and extensive
use thereof by footmen, such conduct on the part of
the railway company can be and should be, as in the
Frye case, in the 200 Mo., construed as amounting to
an invitation by the railway company to use such track
as a passway, and such conduct upon the part of such
company should be held as a qualification of the right
of the company to invoke the provisions of the section
of the statute heretofore referred to in an action by
a person for injuries received by reason of the negli-
gence of the operatives of the railway in failing to
keep a proper lookout for the presence of such person
who is upon the track of the railway by reason of
its conduct in consenting and acquiescing in the free,
continuous and extensive use of such track as a pass-
way. We are unwilling to sanction the principle that
the railway company may invite, consent to and ac-
quiesce in the commission of the trespass designated
by the statute, by persons who go upon the track
at the points mentioned in the statute, and then in-
voke the claim under such provisions that it has the
right to treat such persons as mere trespassers and
owes them no duty to look out for them in the opera-

tion of its trains. In other words, it is not in harmony with sound legal principles to invite and acquiesce in the commission of a trespass and then say to persons notwithstanding we have for years invited you and consented to your presence upon our tracks at certain points, we owe you no duty and you must lookout for yourselves, and notwithstanding you are here by our invitation and with our consent, you will be held amenable as common trespassers. It is fundamental, and the courts of this country have often given expression to the principle, notwithstanding the positive provisions of a statute under which certain business enterprises may have certain rights, yet the action, conduct and course of management in the operation of such enterprises may very materially qualify their right to invoke in their behalf the provisions of such statute.

The cases to which our attention has been directed, in which the rule involved in the case at bar was not applied, in our opinion do not conflict with the other long line of decisions to which we have directed attention. They were simply cases in which the facts developed at the trial did not call for or justify the application of the rule. The cases which may apparently be in conflict have repeatedly been distinguished and differentiated by this court, and in our conclusion of the discussion of this proposition we simply repeat what was said in the Fearons case: "The principle involved in the case a bar is by no means a new one in this State. This court, in a number of cases, has given expression in no doubtful terms to its views upon this subject. A careful examination of the Missouri cases, where similar questions have been involved, will demonstrate clearly a line of demarcation between the two contentions. The doctrines announced in the two lines of decisions are not in conflict; but the principles are correctly declared, as ap-

plicable to the facts in each case. These rules, as to the care and caution to be exercised by operatives of railways, spring from the dangerous character of the business. The law has a right to demand, in the operation of railways, whenever the person or life of an individual is in danger, the exercise of such reasonable care and caution as will avoid the infliction of injury."

## II.

Complaint is made by appellant predicated upon instructions numbered 2, 3 and 4, given in behalf of the plaintiff. We shall not undertake to discuss in detail the criticisms of these declarations suggested by counsel for appellant that these instructions should be subjected to. It is sufficient to say that we have carefully read and re-read them, and while they may be susceptible of some verbal criticism, in the main they are similar to the instructions given in the Morgan and Eppstein cases, and in our opinion did not in any way mislead the jury, and there is nothing in them, nor is there any substantial omission, which would constitute reversible error.

## III.

This brings us to the final contention of appellant, that the motion in arrest of judgment interposed by the defendant should have been sustained by the trial court. This insistence is predicated, as asserted by counsel, on the insufficiency of the allegation in the petition respecting the user of the track by pedestrians. This allegation was substantially as follows: "And which track for many years pedestrians to and from the said town of Carrollton and the said station and depot of defendant at said town of Carrollton had been accustomed to use as a road or footpath by the forbearance and tacit consent of the defendant." As sustaining this proposition we are cited to the case

of Frye v. Railroad, 200 Mo. 377. We have carefully examined that case as applicable to this particular contention, and it is sufficient to say that we cannot agree with counsel for appellant that the Frye case supports the insistence made. The allegation in the Frye case, as said by the court, was scanty indeed, and was compressed in one line, that is to say, speaking of the plaintiff, that he was with the permission of the defendant, by long use and custom, walking on, etc. In that allegation it will be observed that there is an entire absence indicating that the track had been used by pedestrians generally, but in the case at bar the allegation is sufficiently full to meet the objection. It substantially charges that the track for many years to and from the said town of Carrollton and to said station and depot of defendant at said town of Carrollton had been used by pedestrians as a road or footpath by the forbearance and tacit consent of the defendant. This point must be ruled adversely to appellant.

There is no dispute as to the use of defendant's track at the point where plaintiff's husband was killed, as a passway or footpath by the public generally. This use had been open and continuous for more than a quarter of a century, and we are of the opinion that the most ordinary care and prudence would require the operatives of the road at that particular point, in view of the long use of the track by the public, to keep a lookout for persons who might be near the track, and if occasion requires give appropriate signals of danger. This in our judgment is not an unreasonable requirement of the law, and the failure to comply with it should be held to constitute such negligence as would authorize a recovery under the circumstances as clearly appear in the development of the facts in the trial of this cause.

The presentation of this cause to this court, both in oral argument and in the exhaustive briefs filed by the

respective counsel representing respondent and appellant, leaves no room for original research concerning the proposition involved.  About everything has been said by counsel that can be said applicable to the legal propositions before us.  We have given the cause most careful consideration and have indicated our views upon the controlling propositions disclosed by the record, which results in the conclusion that the judgment of the trial court should be affirmed, and it is so ordered.

All concur.