EDWARD SAVAGE v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY AND E. M. WORLAND, Appellants.—40 S. W. (2d) 628.

Division One, June 24, 1931.

*Luther Burns, Henry S. Conrad, L. E. Durham* and *Hale Houts* for appellants.

48

*W. W. McCanles* for respondent.

HYDE, C.—This is a suit for damages for personal injuries. Plaintiff's evidence was that he was employed as a switchman in the yards of the Wabash Railway Company in North Kansas City, Missouri, and that he was earning $6.62 per day for each day he worked. His monthly earnings averaged between $154 and $191 per month.

The main line of the Burlington Railway ran from northeast to southwest through North Kansas City, the North Kansas City station being on the west side of the main line. There was also between the main line and the North Kansas City station the single main track of the Q. O. & K. C. Railway. There were two main line tracks of the Burlington Railway, one being for westbound or incoming trains coming into Kansas City, and the other for eastbound trains. East of the main line tracks was a fourth track known as the Wabash passing track. The Wabash yards where plaintiff was employed lay to the south and east. These yards were very extensive, employing about two hundred men and fifteen switch engines. There was a roundhouse where the Wabash turned their engines, an eating house for employees, and a yard office. The defendant, Chicago, Rock Island & Pacific Railway, ran all its trains over the Burlington main-line tracks from Cameron Junction into Kansas City through North Kansas City. The plaintiff's evidence is not clear as to whether or not the Wabash Railway ran all of its trains over these Burlington main-line tracks through North Kansas City. However, it was shown that they did use these tracks for transferring freight cars from their North Kansas City yards across the river into Kansas City. There were tracks from the Wabash yards to the Burlington main-line tracks and the tracks are referred to at times in the testimony as the Burlington or Wabash tracks. The Wabash had a grain elevator and was also constructing another large grain elevator across the main-line tracks from the North Kansas City depot.

Plaintiff's testimony was that he arrived near the North Kansas City station on a street car from Kansas City, and that several other men employed in the yards came on the same car and preceded plaintiff across the main-line tracks into the Wabash yards, at about eleven p. m. on March 29, 1927. The evidence was that practically all of the two hundred Wabash employees went back and forth across the main-line tracks near the North Kansas City station in going to and from work, and that there were Wabash employees crossing these tracks at almost all hours of the day and night, and that this

use had continued long enough to be known to defendant. There was, however, a road crossing some distance from the North Kansas City station which was sometimes used by the Wabash employees who came in automobiles as the place for crossing into the Wabash yards, but not by those who came to work on the street car.

The plaintiff's evidence was that when he started from the North Kansas City station to go into the Wabash yards he walked angling to the southeast along the station platform across the Q. O. & K. C. track between the tracks and onto the incoming main-line track. Before going on the tracks he stopped and looked both ways. It was a very dark night and he could only see about fifteen feet, but he could have seen a headlight of a train, approaching on the incoming track, for at least a mile. He was walking, looking down, and sometimes to his left, following the white ballast going toward a path which ran from the main-line tracks into the Wabash yard. This was the route he and other employees of the Wabash usually used in going to the part of the Wabash yards to which he was going to report for duty. He heard the sound of a switch engine at times in the Wabash yards, but could not see it because there were cars between him and where the switch engine was working. Just as he was stepping across the south rail of the incoming track he heard a rumble, looked over his shoulder, and saw a dark object upon him which he recognized as an engine. It struck him and he remembered nothing more until he regained consciousness in a hospital. He saw no light and heard no bell or whistle or other sound. The main-line tracks were solid, heavy tracks and the train was coasting through the yards with the steam off, and, under such conditions, it was not possible to hear a train until it was within fifteen or twenty feet.

Three other witnesses testified that they saw the train come in without any headlight and heard no bell or whistle, except that one heard the train whistle for the crossing three-quarters of a mile north of the depot. One of the witnesses was north of the new elevator which was being constructed by the Wabash, upon which there were lights, and saw the name, Rock Island, on the tender. There were lights in the engine cab. It was conceded that two Rock Island trains passed through North Kansas City shortly after eleven o'clock. Defendant Worland was the engineer of the first train. The brakeman of the second train found plaintiff between the two main-line tracks. The second train had a headlight, but plaintiff was not seen by its crew as it came in. The members of the train crew of the first train testified that its headlight was lighted and burning brightly from Cameron Junction to Kansas City. The head brakeman, engineer and fireman all testified that the headlight was on through North Kansas City, that the bell was ringing, and that they were in the cab watching the track, but did not see plaintiff.

The plaintiff's petition alleged that the defendant Railway operated its trains over the main-line tracks of the Burlington and Wabash through North Kansas City. That it was necessary for the employees of the Wabash to cross the tracks at all times of the day and night to get to and from work, and that defendants knew it. The petition further alleged that: "It was the duty of the defendants to exercise ordinary care at the time and place hereinafter mentioned, to avoid injury to the plaintiff and other employees and to exercise ordinary care to warn plaintiff and other employees of the approach of said trains and to equip and maintain headlights on all engines during nighttime." After alleging that defendants negligently operated the engine without a headlight and without ringing the bell or sounding the whistle, plaintiff states that by reason of the darkness plaintiff could not see the train and could not hear it because of other engines being operated in the Wabash yards, and alleges that plaintiff was struck by the train and the extent of his injuries. It further alleged that his injuries were the direct result of defendants' following negligence: (a) Carelessly and negligently running the said engine and train in the nighttime and darkness without a headlight; (b) in carelessly and negligently failing to maintain a headlight upon said engine; (c) in carelessly and negligently failing to sound the whistle or ring the bell or give any other warning when approaching or passing through the said yards and by the said station. The speed of the train was complained of, but this was not submitted to the jury.

Defendants' answer is a general denial and alleged contributory negligence in failing to look and listen and continue to look and listen after going on the tracks. Plaintiff had judgment for $20,000.

The defendants contend that plaintiff's petition fails to state facts sufficient to constitute a cause of action, also that plaintiff's evidence fails to prove a cause of action, and that a demurrer to the evidence should have been sustained. This contention is based upon the argument of defendants that plaintiff was a licensee and that the only duty owed by defendants to plaintiff was to keep a lookout for him and if he was seen, or could have been seen by the exercise of ordinary care in keeping a lookout, then to exercise ordinary care not to injure him after his peril was actually discovered or could have been discovered. They say plaintiff's petition neither alleged any such cause of action for primary negligence, nor states a violation of the humanitarian rule, but proceeds upon the theory that plaintiff was an invitee and that defendants owed him a primary duty of maintaining a headlight on the train and to warn him, by sounding a whistle or ringing a bell, that the train was approaching.

The plaintiff does not claim this to be an action under the humanitarian rule, but that, by reason of the use of the tracks by the Wabash Railway and the necessity of plaintiff and other workmen crossing the tracks at the North Kansas City station, he was an invitee, and further contends that it was defendants' duty to give warning of the approach of a train by headlight, bell, whistle or some other reasonably sufficient warning even to a licensee, and that its failure to do so was actionable negligence.

We do not think that plaintiff's evidence was sufficient to show that plaintiff was an invitee. The use plaintiff was making of the tracks was for his own convenience in going to work, and while, perhaps, the most convenient way for him, he was not instructed to use it and it was not the only way he could have used. In Hubbard v. Wabash Ry. Co., 193 S. W 579, the plaintiff, who was held to be an invitee, was necessarily on defendant's track at the time he was injured and was there performing the work he was employed to do, but plaintiff here was not. If plaintiff had been on the track in the performance of his duty to take cars across the river he might have been within the rule of the Hubbard case. An invitee is one who is on railroad premises for the company's interest and benefit, as well as his own; while a licensee is one who, being neither a passenger, servant, nor trespasser, nor standing in any contractual relation to the company, is expressly or impliedly permitted by the company to come on its premises for his own convenience or gratification. [52 C. J. 538, secs. 2106-2107. See also, 45 C. J. 788, sec. 194; Henry v. Disbrow Mining Co., 144 Mo. App. 350, 128 S. W. 841.] While Sections 4689-90, Revised Statutes 1929, cited by plaintiff, might make the Burlington, as owner of the tracks, also liable to plaintiff, its liability would not, in any event, be greater than that of defendants. This statute does not change plaintiff's status as a licensee to that of an invitee.

We think plaintiff's petition alleges facts sufficient to state a failure to keep such lookout as due care under the circumstances required. While the petition does not directly allege that the defendants did not keep such a lookout as due care required or that they could have seen plaintiff in time to have warned him or avoided striking him if a lookout had been kept, it does set forth facts, such as the darkness and noise in the yards, making it impossible to see or hear the train, and the failure to have a headlight at the time and place, from which such inference may be reasonably drawn. Therefore, for the reasons hereinafter discussed, and under the authorities hereinafter cited in passing upon the sufficiency of plaintiff's evidence, we hold that the petition stated a cause of action.

We also hold that plaintiff's evidence was sufficient for the jury

to find a state of facts under which due care required the defendants either to have a lighted headlight or give warning signals of some kind. To reach this decision we do not think it is necessary to find that plaintiff was an invitee. As was said in Ahnefeld v. Wabash Railway Co., 212 Mo. 1. c. 300· "It is immaterial as to how you denominate the persons who use the track, whether it is said they were invited by the railway company or whether it is said they were licensees, or whether it was a habit and custom to use the track, or whether you denominate them as trespassers; the controlling fact is whether there has been such use of the track as a passway or footpath by the public as to afford reasonable grounds to the operatives of the train upon such track to expect or anticipate the presence of persons so near the railroad track as to endanger them." Upon a showing of such use the court said: "Followed the just, fair and reasonable rule that under such circumstances it would be the duty of the operatives to keep a lookout for the presence of such persons and to use ordinary care and caution in avoiding any injury to them."

It must be conceded here that defendants would have the duty to keep a lookout for plaintiff and other Wabash employees near the North Kansas City station if we assume the truth of plaintiff's petition and evidence in regard to the known use of the main line tracks by the Wabash employees in going to and from work. [Dalton v. M. K. & T. Ry. Co., 276 Mo. 663, 208 S. W. 828; Beard v. Missouri Pacific Railway Co., 272 Mo. 142, 197 S. W. 907; Ulrich v. Grandview Railway Co., 252 S. W. 379; Hubbard v. Wabash Railway Co., 193 S. W. 579; Cotner v. St. Louis & San Francisco Railroad Co., 220 Mo. 284, 119 S. W. 610; Ahnefeld v. Wabash Railway Co., 212 Mo. 280, 111 S. W. 95; Frye v. St. Louis, Iron Mountain & Southern Railway Co, 200 Mo. 377, 98 S. W. 566; Eppstein v. Mo. Pac. Ry. Co., 197 Mo. 720, 94 S. W. 967; Morgan v. Wabash Railway Co., 159 Mo. 262, 60 S. W. 195; LeMay v. Mo. Pac. Ry. Co., 105 Mo. 361, 16 S. W. 1049.]

In Frye v. Railway Co., 200 Mo. 1. c. 401, this court held that a railroad company, by permitting open, known, free, continuous and extensive use of the track by footmen, owed them the duty to use ordinary care to look out for them and ordinary care to protect them from being run down, maimed or killed. Or as was stated in the case of Eppstein v. Missouri Pacific Ry. Co., 197 Mo. 1. c. 733, that when a person unconscious of his peril has negligently placed himself at a place where those controlling a going locomotive have no reason to expect a clear track but have reason to expect the presence of people, then it makes no difference whether such person is seen or not, if to look is to see, and if, thereafter, by the use of ordinary care, the danger may be averted.

In the case of Cotner v. St. Louis & San Francisco Railway Co., 220 Mo. 1. c. 311, the court, in commenting on this rule, said: ''To say that the defendant was in duty-bound to keep a watch out for persons on the track at this point, and yet to say that it might run its trains on a dark night over this point without any headlight on its engine, would be a contradiction.'' The Cotner case was one in which, as in the case here, the plaintiff testified that in walking on the track near the station in a town, at a place customarily used by people going to and from work at all hours of the day and night, he was struck by defendant's train which was running without a headlight and without sounding any bell or whistle. In that case also the members of the train crew testified that the headlight was burning, that they did not see plaintiff, and that the bell was ringing. The court distinguished the case from the Frye case by showing that in the Frye case the plaintiff was walking upon the track in the country, between stations where the right of way was fenced and where the use was not shown to have been at all times of the day and night.

In the case of Beard v. Missouri Pacific Railway Co., 272 Mo. 142, a train was backing with no lookout on the rear of the train. The court held that ordinary care required that someone be there to look out for persons on frequently traveled portions of the track. Ahnefeld v. Wabash Railway Co., 212 Mo. 280, was also a case in which the engine was backing and there was no lookout from the tender. Another case, in which a train was running with the tender in front of the engine piled high with coal so as to shut out the engineer's and fireman's view of the track, was Morgan v. Wabash Railway Co., 159 Mo. 262. Plaintiff was not seen, but the court held that due care required someone in a position to see.

It seems, therefore, that the duty to keep a lookout requires someone in a place to look, and, if too dark to see without it, some means with which to see. A railway company cannot run its trains blind, by having no one where he can see or having no sufficient means to see, and say that it has fulfilled its duty to use ordinary care to keep a lookout. Corpus Juris states the rule to be: ''The company is under a duty to use reasonable care in keeping lights on its engines or cars as to persons whom it has reason to anticipate may be on the tracks.'' [52 C. J. 570, sec. 2133. See also, 15 A. L. R. 1529.]

While ordinarily there is no primary duty to a licensee to give him warning signals of the approach of a train, there may be exceptional circumstances under which due care may require a warning to be given. As is also said in Corpus Juris: ''But where, together *with other circumstances increasing the risk of accident*, the railroad has reason to anticipate that persons will be on its tracks at certain places, as in towns, cities, or populous communities—but not rural communities or sparsely populated regions even though large numbers

customarily use the track—or at other places where persons have been accustomed to cross or go upon the tracks for a long time within the railroad company's knowledge and consent, it is generally its duty to exercise reasonable or ordinary care to give a warning by a bell or whistle of an approaching train." [52 C. J. 575, sec. 2139.]

This court, in Ulrich v. Grandview Railway Co., 252 S. W. 377, said that where a car had just passed a station and was upon a portion of the track ordinarily used by pedestrians, that the company was guilty of negligence in reversing the car and running it backwards upon a dark night and striking plaintiff walking upon the track without giving him any warning signal. In Eppstein v. Missouri Pacific Ry. Co., supra, where the noise of the approaching train could not be heard because of the noise of another train; and in Beard v. Missouri Pacific, supra, in which no lookout was being kept, this court has also recognized that special circumstances may arise under which due care may require the giving of warning signals to a licensee.

Plaintiff's evidence in this case tended to show defendants' engine was running, on a dark night, past the North Kansas City station, where more than 200 employees of the Wabash Railway crossed it at all hours of the day and night, near a busy switch-yard, where there was not sufficient light with which to see a person on the track. Under these circumstances, we think that a jury would be entitled to pass on the question of whether or not the defendants were using due care, even if the headlight had gone out a short time before, if they proceeded without a headlight with which to observe the track and failed to give any warning signals of the approach of the train through the darkness by either whistle or bell. We think this is correct, not upon the humanitarian rule, but upon the question of primary negligence in failing to keep such a lookout as due care required, or if it was impossible to do so, under the circumstances, give warning signals at such a place.

There is another reason, not mentioned by counsel, why plaintiff's petition and evidence is sufficient. Section 4845, Revised Statutes 1929, provides that companies operating a railway in this State are "required to equip, maintain and use upon every locomotive being operated in road service in this State in the nighttime an electric headlight of fifteen hundred candle power brilliancy, measured with the aid of a reflector." This statute also provides that it shall not be construed to prevent a locomotive whose headlight has become defective on the road from proceeding to the most convenient point where facilities exist for remedying such defect (thereby allowing it to escape the statutory penalty prescribed by Sec. 4846, R. S. 1929), "but nothing in this law shall relieve any such company . . . of any liability for injury or damage to persons or property." This section was

enacted in 1913. Violation of a statutory duty is negligence *per se.* [45 C. J. 720, sec. 103; Prapuolenis v. Goebel Construction Co., 279 Mo. 358, 213 S. W. 792.] This is true even of the violation of a city ordinance. [45 C. J. 723, sec. 105; Kidd v. C. R. I. & P. Ry. Co., 310 Mo. 1, 274 S. W. 1079.] Plaintiff's evidence was sufficient to show that defendants' failure to comply with this statutory duty was the direct cause of his injury.

Plaintiff's instruction numbered 1, complained of by defendants, would probably not be sufficient to properly submit the question of failure to keep such a lookout as due care, under the circumstances, required, since it does not require the jury to find even the facts alleged in the petition as to the darkness and noise from which it is possible to infer that it would be necessary to have a headlight to keep such a lookout. However, in view of the statutory duty to maintain and use the headlight, this instruction is sufficient. It requires a finding that on the date alleged, defendants were operating a locomotive over the Burlington track through North Kansas City; that plaintiff was in the employ of the Wabash; that about 11:10 to 11:15 P. M. plaintiff was crossing the track; that it was usual, customary and necessary for plaintiff and other Wabash employees to cross at said place in order to get to the place of employment at all times of the day and night; that defendants knew it; that while plaintiff was going to work at the time and place, defendants permitted the locomotive to strike him; that the locomotive was being operated without a headlight; that defendants did not ring any bell or give plaintiff any reasonably sufficient warning of its approach; that in all the foregoing respects defendants were negligent; that as a direct result of the negligence, plaintiff was injured; and that plaintiff, at the time and place, was exercising reasonable care for his own safety.

This covers all the facts which were necessary to show the violation of the statutory duty and that the violation thereof caused plaintiff's injury.

Defendants also insist that the plaintiff was guilty of contributory negligence as a matter of law. Plaintiff had evidence to show that the track upon which the train approached was straight for more than a mile, and that if there had been any headlight upon the engine he could have seen the train for at least that distance. There was also evidence that the train was coasting through the yards noiselessly, and that it could neither have been seen nor heard until it was within fifteen or twenty feet. There was also evidence of other noises which made it impossible for plaintiff to hear the train. Plaintiff testified that he did look and listen before going upon the tracks, and the evidence is not definite as to how far he walked thereafter. Under these circumstances, and under this court's decision in Cotner v. St. L. & S. F. Ry. Co., supra, we believe that the issue of contrib-

utory negligence was properly for the jury. [See also, Bluedorn v. Missouri Pacific Ry. Co., 121 Mo. 258, 25 S. W. 943, 108 Mo. 439, 18 S. W. 1103.]

Defendants also complain of the action of the trial court in refusing instructions lettered P and Q, which were as follows:

"P. The jury is instructed that even though you may find and believe from the evidence that the headlight of the engine of the train which plaintiff claims struck him was not burning at and immediately prior to the time of his injury, nevertheless, if you find and believe from the evidence that when said engine entered upon its run then in progress, it was equipped with a headlight in proper order and burning condition and that said headlight had gotten out of order or failed to burn on said journey and that thereafter, if you so find, a reasonable time had not elapsed within which the defendant, in the exercise of ordinary care, might have corrected the same before plaintiff's injury, your verdict must be for the defendant.

"Q. The jury is instructed that if you find and believe from the evidence that at and immediately prior to the time of plaintiff's injury the locomotive or engine of the train which he claims injured him carried a headlight which was burning, then plaintiff is not entitled to recover in this cause, and your verdict must be for the defendants."

It will be noted that Instruction P does not take into consideration the possibility of a duty to warn, under the circumstances, in this case. It excused the defendants from running the engine without any headlight past the station and along the Wabash yards, regardless of whether or not due care required them, after discovery that the headlight had gone out, to give some warning signal of the approach of the train at such a place. Nor was the instruction proper in view of the statute.

We do not think there is any reversible error in refusing to give Instruction Q, since the same proposition was stated in another form in Instruction G given by the court, which told the jury that the plaintiff had the burden of proving that the headlight on the engine was not burning at, and immediately prior to, the time plaintiff was injured.

We now come to the question of whether or not the verdict is excessive. Plaintiff's evidence shows that at the time of his injury he was forty-six years old. He had had years of experience as a railroad switchman, car inspector and assistant trainmaster, and had at times earned larger amounts than he was earning at the time of his injury. His injury to his right hand was the loss of the first two fingers and the mashing of the bones of the hand. A plastic operation was performed to save as much of the hand as possible, but his hand was stiff and useless and

he had very little movement of the remaining fingers. The muscles of his arm and shoulder were atrophied and his arm and shoulder pained him continually. There was medical evidence to the effect that his hand and arm were practically useless. His evidence also was that his skull was fractured and that he had no feeling above his left eye. He was unconscious, or in a semi-conscious condition, for several days after being injured. There was a gash in his head which it was necessary to sew up and which has left a large scar. He suffered great pain from these injuries and was in the hospital for treatment at Kansas City, Emporia and Moberly for several months. He has violent headaches and dizzy spells and cannot stand any heat or to be in the sun, and this condition has grown worse. His vision has been affected, and his left eye is smaller than his right eye. There was also medical evidence to the effect that there is a depression in his skull at the place where it was fractured from which there is pressure on the brain, and that, as a result, he has lost balance. The medical evidence also is that this pressure causes headaches and dizzy spells and is a permanent injury causing a nervous condition and loss of control which will continually grow worse. Plaintiff, before his injury, was in excellent health and physical condition. He has been permanently incapacitated from following his occupation as a railroad switchman or trainman and is living on a small farm where he can do the work of attending to raising sheep and chickens and other light tasks, at least part of the time.

After a thorough consideration of the record and the former decisions of this court, we cannot say that the present verdict is excessive. In Keyes v. C. B. & Q. Ry. Co. (Mo.), 31 S. W. (2d) 50, a verdict of $10,000 was upheld for a common laborer sixty-four years old, earning $90 per month, and whose injury was a skull fracture which does not appear to have been as serious as plaintiff's here. In Leighton v. Davis (Mo.), 260 S. W. 986, Coleman v. Rightmyer (Mo.), 285 S. W. 403, and in Mattice v. Term. Railroad Assn. (Mo.), 270 S. W. 306, verdicts for $10,000 or more for injuries causing the loss of the use of the hand and arm were sustained. The judgment is affirmed. *Ferguson* and *Sturgis, CC.,* concur.

PER CURIAM:—The foregoing opinion of HYDE, C., is adopted as the decision of the court. All of the judges concur.