# J. W. COTNER v. ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY, Appellant.

**Division Two, May 18, 1909.**

1. **PLEADING: Amendment: From Special to General Damages.** It is competent to permit plaintiff, after the jury is impaneled and before the evidence is heard, to amend his petition by striking out the prayer for fifteen thousand dollars general damages and for three thousand dollars special damages for medical attention, etc., and by inserting a prayer for eighteen thousand dollars general damages. It is not a change of a cause of action, nor the substitution of a new cause, but an amendment, and the same proof would have necessarily supported either petition.

2. **NEGLIGENCE: Pedestrian on Track: Demurrer.** Plaintiff testified that when he went on the track he heard a whistle sounded south of the village, and he turned and looked in the direction from whence the sound came; that the night was dark, and he could see nothing, and concluded the whistle was that of a gin located near the track; that he then turned and started north on the track and had gone about fifty feet when the engine struck him. Other witnesses testified they heard a whistle at the south limits of the village, which they thought was the gin whistle. Various witnesses testified that no bell was rung, no whistle was sounded, and no headlight was on the engine. *Held*, that it was for the jury to determine whether plaintiff knew of the sounding of the whistle and whether he honestly believed it was the gin whistle, and the court did not err in submitting the case to the jury.

3. **————: ————: Footpath: Anticipating Presence: Mixed Question of Law and Fact.** The place where plaintiff was walking on the track and was struck by the engine was about one hundred feet from the station, and within the corporate limits of the village. Ever since the construction of the track it had been used by pedestrians as a footpath, by day and by night, and that it was so used was well known to the station agent, and no objection, either verbally, or by posting notices to all persons to keep off, had ever been made to such use. The right of way was not fenced, nor was there any inclosure of any kind along the right of way. *Held*, that the question of whether or not the engineer and other employees in charge of the night train were required to anticipate plaintiff's presence at the place where he was injured, was a mixed question of law and fact, and was properly submitted to the jury.

4. ———: ———: ———: ———: **Ringing Bell: Headlight.**
Where the evidence tends to prove that the place of injury was
one where the engineer should have anticipated the presence
of persons on the track, one of the most ordinary precautions
which ordinary care would have dictated to him on a dark
night would have been the ringing of the bell and seeing to it
that a headlight was on the engine and kept burning. Defendant
owed the pedestrian on the track that duty, and failing to
perform it, if injured and without negligence on his own part,
he can recover.

5. ———: ———: **Drunkenness: Instruction.** Where the court
told the jury that if plaintiff was intoxicated he could not re-
cover if he failed to exercise the care of a sober man, it was not
error to modify the instruction by striking out the words:
"Even though you further find that defendant's employees in
charge of the train were negligent in managing the train in the
manner alleged in the petition, and plaintiff was injured."

6. ———: **Evidence of Headlight.** Witnesses who did not see
the locomotive before the injury, but did see it almost imme-
diately afterwards, are competent to testify that no headlight
was burning when they saw it, and such evidence put upon
defendant the burden of showing the light had gone out after
the injury.

7. ———: **Pedestrian on Track: Case for Jury.** Although the
evidence was conflicting, yet if there was evidence tending to
show that there was no headlight upon the engine, that no bell
was rung, that the plaintiff on a dark night was walking on the
track which was habitually used by people of the village and vi-
cinity as a footpath, that before going upon the track he stopped,
looked and listened and saw no train approaching, and while
he heard a whistle he was led to believe it was a gin whistle
because he could not discover any train, and that he had gone
not more than fifty feet before he was struck by the engine,
the case was one for the jury, under proper instructions; and
as the instructions required them to find that there was no
bell rung or headlight burning or whistle sounded, after the
engineer and fireman by the exercise of ordinary care could
have seen him on the track in time, etc., to stop the train with-
out hitting him, etc., and did not, and the jury found for plain-
tiff, their verdict will not be disturbed.

Appeal from Pemiscot Circuit Court.—*Hon. Henry C.
Riley,* Judge.

**AFFIRMED.**

*W. F. Evans* and *Moses Whybark* for appellant.

(1)   The court erred in permitting plaintiff to amend his petition after the jury had been empanelled, and the petition read.   No notice of the intention to amend had previously been given defendant of his intention to amend, and the amendment changed the cause of action after the trial began, and in a material matter. , Pruett v. Warren, 71 Mo. App. 84; Purdy v. Pfaff, 104 Mo. App. 331; Riley v. Railroad, 124 Mo. App. 278; Liese v. Meyer, 143 Mo. 547; Scoville v. Glassner, 79 Mo. 449.   (2)   Plaintiff went upon defendant's railroad track about midnight, on a dark night, having heard the train before he did so, and at a time of night when defendant's employees, under the facts in the case, were not required to anticipate the presence of any one on the track at the point of the accident; besides, he had heard the train whistle, and took no precaution to protect himself from injury, and he is not entitled to recover.   Petty v. Railroad, 179 Mo. 678; Frye v. Railroad, 200 Mo. 377; Lenix v. Railroad, 76 Mo. 86; Tanner v. Railroad, 161 Mo. 497; Moody v. Railroad, 68 Mo. 470; Taylor v. Railroad, 86 Mo. 457; Hickson v. Railroad, 80 Mo. 335; Railroad v. Wilkins, 83 C. C. A. 27 (153 Fed. 845); Toomey v. Railroad, 10 L. R. A. 139 (86 Cal. 374); Montgomery v. Railroad, 181 Mo. 477.   At the point of injury in the town of Steele, defendant was not required to anticipate the presence of any one on the track at the time of the injury, and its liability is limited to the want of care occurring after the exposed and dangerous position of such person on the track came to the knowledge of its servants and employees, and that knowledge did not come to them until after he was struck.   Dunkham v. Railroad, 95 Mo. 233; Railroad v. Wilkins, 83 C. C. A. 27 (153 Fed. 845).   (3)   Under the facts in this case defendant owed plaintiff no duty either to ring the bell, or sound

the whistle. Rine v. Railroad, 88 Mo. 398; Bell v. Railroad, 72 Mo. 50; Mellon v. Railroad, 99 Mo. App. 286; Karle v. Railroad, 55 Mo. 476; Holland v. Railroad, 210 Mo. 338; Railroad v. Gravitt, 26 L. R. A. 553; Spicer v. Railroad, 11 L. R. A. 385, 34 W. Va. 514; Toomey v. Railroad, 10 L. R. A. 139, 86 Cal. 374; Railroad v. Wilkins, 83 C. C. A. 27, 153 Fed. 845. (4) The absence of a headlight on the locomotive was not, under the facts in this case, the omission of a duty of which plaintiff can complain. He was not in a position to give him a right to complain of this as negligence to him. Frye v. Railroad, 200 Mo. 407; Becke v. Railroad, 102 Mo. 544; Railroad v. Chambers, 15 C. C. A. 327, 68 Fed. 327; Williamson v. Railroad, 70 L. R. A. 1007, 104 Va. 146, 51 S. E. 195; Toomey v. Railroad, 10 L. R. A. 139, 86 Cal. 374; McGee v. Railroad, 102 Mich. 107, 60 N. W. 293; Montgomery v. Railroad, 181 Mo. 477. (5) Plaintiff's own evidence shows that he stepped on the track in front of the train, conscious that it was coming. Zimmerman v. Railroad, 71 Mo. 488; Moore v. Railroad, 176 Mo. 544; Hutchinson v. Railroad, 195 Mo. 546; Green v. Railroad, 192 Mo. 131; Yancey v. Railroad, 93 Mo. 433; Schmidt v. Railroad, 191 Mo. 215; Ross v. Railroad, 102 S. W. 1036; Sanguinette v. Railroad, 196 Mo. 466. (6) Instruction 9 as asked by defendant is the law of this case, and ought to have been given. Frye v. Railroad, 200 Mo. 377; Williamson v. Railroad, 70 L. R. A. 1007 (104 Va. 146); Toomey v. Railroad, 10 L. R. A. 139; Smith v. Railroad, 25 L. R. A. 287 (114 N. C. 728); Yarnall v. Railroad, 75 Mo. 578; Maher v. Railroad, 64 Mo. 267; Bunyan v. Railroad, 127 Mo. 17; Purl v. Railroad, 72 Mo. 168; Carrier v. Railroad, 175 Mo. 470; Barker v. Railroad, 98 Mo. 53; Schmidt v. Railroad, 191 Mo. 215; Sinclair v. Railroad, 133 Mo. 238; Reardon v. Railroad, 114 Mo. 284; Fusili v. Railroad, 45 Mo. App. 535; Zumault v. Railroad, 175 Mo. 288; Petty v. Railroad, 179 Mo. 678. (7) The

court erred in permitting plaintiff to prove over the objection of defendant by the witnesses J. R. Jenkins, Roscoe Wall, W. T. Wall, and Mrs. W. T. Wall that the locomotive had no headlight. These witnesses did not see the locomotive for some time after the injury and then it was a distance of a mile or more north of the point of injury. This testimony ought to have been excluded. Frye v. Railroad, 200 Mo. 377; 22 Am. and Eng. Ency. Law (2 Ed.), 1238, 1239; 21 Ib. 510.

*Duncan & Bragg* for respondent.

(1) Plaintiff admits he was upon defendant's railroad track at the time he was injured by the engine and train of freight cars operated by defendant, but insists that he had a perfect right to use the track and right of way the way he was using it. Eppstein v. Railroad, 197 Mo. 720; Reyburn v. Railroad, 187 Mo. 573; Fearons v. Railroad, 180 Mo. 222; Morgan v. Railroad, 159 Mo. 262; Chamberlain v. Railroad, 133 Mo. 587; Everett v. Railroad, 112 S. W. 486. (2) The law charges trainmen with the duty of keeping a lookout to prevent danger, and they must exercise ordinary care to discover persons upon their tracks in populous neighborhoods or villages. A failure to see is not alone a sufficient defense to injury; care must be exercised and an honest effort made to see. The law does not require an engineer to stop his train at the approach of every person upon the right of way, but it does require him to give such signals as he may have at hand, and as the situation reasonably requires. He cannot avoid the just consequences of a jury's fair finding upon the flimsy pretext that he did not see the injured, when, by doing what the courts require, he could have seen and averted the accident. Everett v. Railroad, 112 S. W. 486; Chamberlain v. Railroad, 133 Mo. 587; Morgan v. Railroad, 159 Mo. 262; Reyburn v. Railroad, 187 Mo. 573. (3)

The record discloses that the train was not making over four miles an hour, was without a headlight and gliding almost noiselessly to a stop. The engineer asserted his ability to stop the train within six feet considering the appliances at hand. Certainly had he been faithful at his post of duty and not guilty of wanton negligence this deplorable accident could have been averted. Had the headlight been burning plaintiff could have easily been made aware of his peril and avoided the lamentable disaster which has made him a cripple for life. Everett v. Railroad, supra; Becke v. Railroad, 102 Mo. 544; Fearons v. Railroad, 180 Mo. 222. (4) The trial court committed no error in permitting witnesses J. R. Jenkins, Hugh Woodard, Roscoe Wall, W. T. Wall and Mrs. W. T. Wall to testify with reference to the absence of a headlight burning on the engine that injured plaintiff, nor as to what distance a person could be seen upon a track with a headlight burning. Eppstein v. Railroad, 197 Mo. 720; Becke v. Railroad, 102 Mo. 544; Everett v. Railroad, 112 S. W. 486; Fearons v. Railroad, 180 Mo. 222.

GANTT, P. J.—This is an action for damages from personal injuries alleged to have been caused by the negligence of the defendant, its agents, servants and employees, commenced and tried in the circuit court of Pemiscot county.

At the June term, 1905, the plaintiff filed an amended petition, in which he stated the incorporation of the defendant and then alleged that on November 4, 1904, while he was walking northeastward on the railroad tracks of the defendant, within the village limits of the village of Steele in Pemiscot county, Missouri, an incorporated village, duly incorporated under the laws of Missouri, where the track was level

and straight for a long distance and where from the time of its construction pedestrians had been accustomed to use the same as a footpath by the forebearance and tacit consent of the defendant, plaintiff, by reason of the carelessness, negligence and recklessness of defendant's agents, servants and employees in charge of this train, was run over and injured; that after the defendant's agents, servants and employees in charge of said train seeing or, by the exercise of reasonable care and diligence, had they not been reckless in operating said train at a late hour in the nighttime, to-wit, about eleven o'clock p. m., without a headlight lighted upon the front part of its engine or train of cars, could have seen the dangerous position in which plaintiff was situated, and saw, or by reasonable care and diligence, if said train had not been recklessly operated by defendant's agents, servants and employees in charge thereof, could have seen, the imminent peril in which plaintiff was placed and that the plaintiff was unaware of the dangerous approach of said train, failed to sound the usual and ordinary signals in time to avert the injury herein complained of and in fact did not at any time, before the injury to plaintiff, either ring a bell, or whistle, or give any other signal by which the plaintiff might be warned of the near or dangerous approach of said train, and negligently failed to use the brakes and other appliances provided for the stopping of said train, made up as aforesaid, and negligently failed to use the appliances at hand for the putting of said train under control and stopping the same before it struck and injured plaintiff, but on the contrary thereof, recklessly, negligently and wantonly ran its engine and train of cars against, upon and over plaintiff, thereby mashing his right foot and ankle, necessitating amputation of the right foot and leg, also wounding and bruising him upon the back and head, dislocating his left ankle, and giving to him other external and in-

ternal injuries, causing vomiting, and passing of blood
through his urine; that by reason of the injuries afore-
said plaintiff is permanently disabled, to his damage
in the sum of fifteen thousand dollars. And plaintiff
further states that by reason of the aforesaid injuries
he has suffered great distress in body and mind, pain
and mental anguish and has been caused to expend
large sums of money for care and medical attention to
the amount of three thousand dollars. Therefore, he
prays judgment for eighteen thousand dollars.

At the same term, the defendant filed its answer,
admitting its incorporation, denying all the allegations
in the petition, and further replied that the plaintiff
at the time he received his injuries voluntarily ex-
posed himself to danger on the tracks of the defend-
ant and was a trespasser and under the influence of
alcoholic stimulants to the extent that he was in a
drunken condition, and if he was injured as alleged
in the petition, such injuries were the result of his
own carelessness and not the carelessness of the de-
fendant.

The replication of the plaintiff was a general de-
nial of the new matter set up in the answer.

At the same term the cause was tried before a
jury and a verdict and judgment rendered for the
plaintiff for five thousand dollars. In due time the
defendant filed its motion for a new trial, which was
by the court overruled.

After the jury were sworn, the plaintiff by leave
of the court amended his petition by striking out the
damages, to-wit, fifteen thousand dollars and three
thousand dollars for special damages, and inserted in
lieu thereof eighteen thousand dollars as general dam-
ages. To which amendment the defendant excepted
at the time.

The evidence on the part of the plaintiff tended
to prove that he lived a mile and a half from the
village of Steele; that on November 4, 1904, he went

to said village and about eleven o'clock that night, while he was walking upon the track of the defendant in a northerly direction and about one hundred feet from where the wagon road crosses the railroad, he was struck by a train of the defendant; before going on the track he heard something like a train blowing down on the other side of the railroad crossing and stopped and looked down the track, but could see nothing, and then started on the track towards his residence and was knocked off. The track was straight for more than a mile and there were no obstructions of this view. He had only walked about twenty-five feet before he was struck. There was no signal given and no bell rung to give warning of the approach of the train. The engine struck him and knocked him down and his left foot was thrown out of place, and his right leg and foot were mangled, the foot being cut off. His back and hips were badly mashed and he was confined to his bed for four months. He testified that the track had been used for a footpath ever since he had lived in the neighborhood, for about four years; all the sawmill crew for three mills used it as a footpath, besides many others used it regularly. On cross-examination, he said there was nothing but a rock road the way he was going; the night was cloudy, but no rain or snow. He had been in a restaurant and saloon before starting home and had taken three or four drinks and bought a pint of whiskey, he was not intoxicated that evening, just felt good and sang some. He heard a whistle, but did not see any light, thought it was a cotton gin whistle. He was not sitting down when struck, saw no one else on the track and did not know the train was coming; he thought the train had passed and could have seen it if its headlight had been burning, but there was no headlight. There was no bell rung, and he could not hear the train coming on account of steam escaping

from Perkins' gin. The injury occurred within the corporate limits of the village of Steele.

Woodward, a witness for plaintiff, testified he lived in Steele, and kept a boarding house; he saw the engine and there was no headlight on it, could have seen train approaching for some distance if the engine had been lighted, could easily have seen it for three-quarters of a mile, was sure there was no headlight. He passed in front of the engine and rode upon it that night. On cross-examination, he stated that the plaintiff was taken from under the train before he arrived at the place of injury. The train did not whistle nor was any bell rung. He had often seen foot-passengers travel up the track during the eight years he had lived in the neighborhood, they used it as a footpath, and traveled it very frequently. It had been used as a footpath ever since the track was built. The company kept a depot agent at Steele.

Dr. Swearingen treated plaintiff and testified that amputation was necessary. One of his legs was ground half way to the knee. His right foot and leg were ground off. He also had bruises on his back and side and his left ankle was dislocated, he was badly bruised in his hips and lumbar regions and had a gash on his head. On cross-examination the doctor identified the plat and location of the streets and crossings.

J. R. Jenkins testified that he lived three or four hundred yards from where they brought Cotner and put him off at Wall's. He could see down the track from his house and did not see any headlight. The railroad was the only passway in that neighborhood in the winter time, and the only way they could get to Steele. There was an agent at Steele, who knew that the right of way and track was used by pedestrians. The track was used by pedestrians both day and night.

Thomas Roe also testified that there was no headlight on the engine; that there was no signal given at the road crossing, nor while the train was passing through the town, except a whistle down at Mississippi Valley crossing, which was one hundred yards below his house.

Roscoe Wall testified that he lived about three-quarters of a mile up the track from Steele when plaintiff was hurt, saw the train that night, it was then even with his house, and it came there for his father to go up for plaintiff. There was no headlight burning that night, and there was no headlight burning on the train on the second trip. He was a brother-in-law of the plaintiff. The train came up to his father's house and got him and then backed down and brought plaintiff back. He was sure there was no headlight; the night was dark, but not cloudy.

W. T. Wall, for the plaintiff, testified he saw the engine first at his house three-quarters of a mile above Steele, and was told that it had run over Cotner. He got on the engine and went down with them. He stated there was no headlight, and thought if there had been one he would have seen it as he went down to Steele on the engine with fireman in the cab and found the plaintiff there injured. He was the plaintiff's father-in-law, and they came to his house with the engine for him and he got on it and went back to Steele. He had lived there for about four years and plaintiff lived about one-quarter of a mile from him. He knew the place where plaintiff was hurt, and the train could have been seen south for a distance of a mile and a half, he thinks. He knew the track was used as a footpath, and he had seen others use it for that purpose. William Reed on behalf of plaintiff stated that he was acquainted with the plaintiff and saw him the night he was hurt and left Laden's saloon with him. Plaintiff went one way and he went the other. Witness had gone nearly a half a quarter be-

fore he heard the train whistle. He was about a quarter of a mile from the saloon and was half way home and it was a few minutes after eleven o'clock when he got there. He did not know whether plaintiff was drunk or not, he never saw him take drinks, and when he left him he walked as straight and nice as any one; he did not act like he was drunk; he thought he was sober enough to take care of himself. The train whistled below Steele for the crossing; he did not remember taking a drink with plaintiff that night. Witness was sober, but had taken three or four drinks, he thought. He had seen plaintiff drunk several times, but never saw him dog drunk, but that night, so far as he could see, plaintiff was not under the influence of liquor. He thought that when a man was drunk he was not able to attend to his business.

This was substantially all the evidence on the part of plaintiff.

On the part of the defendant, Charles Johnson testified that he lived at Steele about two years, and in November, 1904, he was barkeeper for Coleman & Gibson. He had known plaintiff five or six years, saw him the night he was injured; he was in the saloon drinking right smart; he was intoxicated and was not walking right straight, but was not boisterous, saw him take several drinks, and sold him a bottle of whisky about ten o'clock that night. He was asked what plaintiff's habits were about lying down when he got full. His answer was that he did not know, he never saw him down dead drunk. On cross-examination, he stated that he did not know what plaintiff did with the whisky he sold him that night. He sold him several drinks during the day, but did not remember whether it was in the morning or afternoon. Plaintiff was not so drunk that he did not know what he was doing.

J. P. Lee testified that he was marshal when plaintiff was hurt and had known him about six years,

saw him the night he was hurt at Steele; did not re-
member that he saw him take a drink, he seemed a
little intoxicated and had a bottle of whisky and some
of them drank with him out of the bottle, he was going
on with his fun as he usually did when he was drink-
ing. Witness went home between eleven and twelve
o'clock that night, and thought he heard the train
come in a short while after he left plaintiff; when he
left him he went from two hundred to two hundred
and fifty yards. Plaintiff was in the habit of getting
under the influence of liquor. Witness took a drink
out of the pint bottle with plaintiff that night, and
left him, and plaintiff went one way and he went the
other. Plaintiff was drinking some but not so much
as not to know how to take care of himself.

Gibson & Coleman's gin was south of the depot
near the crossing of the Mississippi Valley Railroad
and the Steele Supply Company's gin was right op-
posite it on the other side.

Laden testified that he lived at Steele, was a saloon-
keeper. He had known plaintiff about two years and
saw him the night he was hurt, in his saloon, and he
seemed to be drinking, but was able to get where he
pleased; about ten o'clock that night he saw plaintiff
drink a couple of bottles of beer. The witness sold
him a pint of whisky a little after ten o'clock. While
plaintiff was drinking some he was going where he
pleased and came into the saloon with another man
and took a couple of bottles of beer.

J. W. Foster testified that he lived at Steele and
did one thing and another and railroaded some this
summer and was night watch in November, 1904. He
had known plaintiff about two years and remembers
the night he was hurt, but had not seen him that
night before he was injured. He heard the train come
in about half past eleven and it blew a couple of
whistles for the crossing but he did not hear the bell
ring. Witness was inside of the cotton gin of the

Steele Supply Company, in the engine room, with his brother. The gin was not running, had been shut down about six o'clock that evening; he heard a man groan, and his brother picked up a lantern and they went out to the train and saw the plaintiff lying under the train about sixty-five or seventy feet from the engine room. There was another gin located down near the Mississippi Valley railroad; that gin had been run through the day, but shut down about the same time. This last gin is about one hundred yards from the depot platform. He heard a train whistle down there about a hundred yards from where the plaintiff was found. On cross-examination, he stated that he could not tell what the whistle was; he heard it, but thought it was the other gin whistle. The whistle on the engine was similar to that on the gin. He could not state whether there was a headlight on the engine or not that night, as he was not in front of it. He stated as a matter of fact that if the headlight had been burning, he might have seen the reflection on the track, but he could not be positive about it. He stated he heard the train coming in, but not distinctly on account of the gin. He heard the train, however, after it got into the yard; could hear it plainly after it reached the station. He stated the gin at which he worked ran sometimes at night, but the other one not to his knowledge.

Underhill, the engineer, testified that he was on the locomotive when the plaintiff was injured. The train reached Steele at 11:55 that night and ran between Big Creek and Hayti. And in coming to Steele he blew one long whistle at every railroad crossing and stopped and blew two more. The fireman rang the bell all the way from the crossing up to the time he stopped and he stopped the train four or five cars north of the platform; he stopped because he got a signal from the brakeman to slack ahead until they got the car where they wanted it to stop. After passing the crossing they were running about three miles

an hour and the headlight was burning. He was on the right side of the locomotive looking ahead and the fireman was on the left side. The bell stopped ringing just about the time they stopped. He saw no one on the track before the injury occurred before stopping his train, and there was no light in the town at all except the switch light, which was burning. He looked to see if the switches were in right shape and the brakeman told him the freight was in the first car, the local next to the engine, and the through cars and locals at the back end. He came in slow so he could stop the first car if they wanted it, and they gave him the signals and he kept on going, and about the time the stop signal was given he heard something under the tank, and after he got the car where they wanted it, stopped; he stopped the car and could find nothing wrong; after they gave him the signal he did not look ahead as he could look but one way at a time and he looked back for signals, but he had looked up the track, and everything was clear and then he looked back for the signals. The brakeman was behind to tell him where to stop, and at the rate he was going he could have stopped within five or six feet. The night was dark. After he looked up the railroad he ran two or three car-lengths before he felt something under the tender. He stopped the train about two or three car-lengths after he felt the jolt. After that the head brakeman found the man under the train. The brakeman saw him lying there, with his lantern, under the car, and came up looking the same way; he thought the brakebeam was down, and he found the man lying there with his face down and his head to the south; from his position on the track witness thought plaintiff must have been lying plumb flat down when the engine hit him. He took his lantern to see if anything had touched the pilot, but there was no evidence of anything having crossed the pilot. The track had been ballasted with rock, there was a path

on both sides, but he never saw any one walk along. in the middle after the rock was put on it, it was so rough. He and one of the brakemen took the plaintiff from under the train and carried him to the platform and afterwards took him down to Mr. Wall's. The headlight had burned all night, it was a good headlight for oil and would throw the light sixty to seventy feet clear, and if a man was standing on the track he could be seen, but if he was down on the track he could not be seen like as if he was standing up, and the headlight does not show on the side of the track where there are weeds, but on the center and on the rails. When he took the man from under the car he smelled whisky. On cross-examination he stated that it was his business to see that the headlight was burning and after they got to Steele, they came to the platform and stopped; he had a headlight all the way through. From the way the plaintiff was lying when he found him it appeared that he was lying down on the track. He did not know whether he was dragged or not. He did not look like he was dragged, he had a pint of whisky in his pocket, the bottle was not broken. The plaintiff crawled out to them, himself, so that they could get hold of him. He started to go on the far side but witness told him to crawl out where the lights were. They took him up and could see that his foot was mashed. He stated that if his headlight should go out, it was his duty to put a white lantern out. It is not an uncommon occurrence for the headlight to go out, and it can be seen at once. He frequently passed over that road at that point at night with his engine and had never observed any one walking on or near the track at night.

Gilpin testified that he was a brakeman for defendant on the train that night and his duty was to do the switching; they got to Steele between 11 and 11:55 that night, were six or seven hours late. Witness is now a brakeman on the M., K. & T. railroad.

The engineer blew for the station and the crossing; it is a half mile from the crossing to the whistling board signal post, where the whistle is sounded at the station. Did not remember whether the bell rung, as he was in the caboose. Witness gave the engineer the signal to go ahead; he wanted to pull up to the platform to unload two crates of grapes and he signaled for him to stop at that point. When the grapes were unloaded he signaled to go ahead, but the engineer was down with a torch. After he gave the signal to go ahead, he heard the man hollow and the engineer was down on the ground with his torch. The man was about five or six cars behind the engine, between the rails with his head to the south and west, and was out from under the rails all but his foot that was mashed and sticking to the rails against the wheel; could not say whether there was a headlight when he went down there, and he got there in two or three minutes; he had noticed the headlight burning at Holland three miles south. The train was going about three or four miles an hour when they came into Steele and could have been stopped in thirty or forty feet. Plaintiff was about one hundred feet north of the platform. The bell was rung after the train crossed the railroad crossing 660 feet from the depot, he heard it ringing when he came out to unload the grapes. Witness went after the doctor. The agent was not at the depot. No train was due at Steele at that hour.

T. J. Odom was the fireman on the train that night. He testified the headlight was burning when plaintiff was hurt. As the train approached Steele the first signal was one long whistle for the station, then two long whistles for the stop at the railroad crossing, and then they pulled up town, and he began ringing the bell before they crossed the crossing and rang it up into the station, but does not know how far north of the depot the engine stopped. They

stopped the caboose at the platform to unload some
grapes and he quit ringing the bell when the engine
stopped. Just before the engine stopped he straight-
ened up. He did not see any man or object on the
track and was looking up the track to see if it was
clear and could have seen a man if he had been stand-
ing upon the track that night any where ahead of the
engine for a distance of one hundred feet. He did not
discover a man under the train; the engineer and
brakeman found him under the car. The engineer got
his lantern and got off the engine and went back; he
helped take the plaintiff and lay him on the platform;
he had a bottle of whisky in his pocket and he smelled
his breath and he had been drinking. The train was
not puffing in the usual manner, as the engineer was
using just enough steam to drag the train there, but
it made the usual engine noise. The track was bal-
lasted with rock. There was a path up and down
where the people walked outside of the rails at the
end of the ties. The track was rough. The head-
light was burning when they reached Steele and when
they left there and burned all the way to Hayti from
the time they left Blythesville. He did not see plain-
tiff when they struck him. He never saw the engine
running without a headlight, and could not say how
long he had worked on the engine before the accident.
The pilot was seven inches high. It was the duty of
the engine crew to keep a lookout ahead upon the
track, and he was doing so. The engineer was not
drunk and there was no other train scheduled to be
there that night after theirs. They were seven hours
late, but not on account of any trouble with the head-
light. Witness's duty was to keep the engine hot and
help the engineer and right smart of his time was
employed in shoveling coal. The engineer stopped the
train immediately when they gave him the signal to
stop, he did not go over a few car-lengths; if some
one had been seen on the track they could have stopped

it in ten feet. The engine was provided with air-brakes and other appliances for stopping and had a steam whistle.

J. F. Halterman was a brakeman on the train also that night. He corroborated Odom as to the headlight being lighted and as to the giving of the signals for the station and at the crossings. Could not remember whether the bell was rung or not. He assisted in taking plaintiff from under the train, he tried to question him to find out who he was, but he did not answer. Did not hear him make any statement before he was moved, was not positive he was lying with his face down, but thinks he was.

In rebuttal the plaintiff offered a number of witnesses who testified that the train did not have a headlight lighted on the front part of the engine, and to the fact that the whistle was not sounded, one witness saying that he heard the whistle, but thought it sounded like the cotton gin whistle.

This was substantially all the evidence in the case.

I. The first error assigned by the defendant is that the court erred in permitting the plaintiff to amend his petition after the jury had been impaneled, and before the evidence was heard, by striking out the prayer for three thousand dollars special damages, and by making his prayer for general damages eighteen thousand dollars instead of fifteen thousand dollars. It will be noted that the only change made was to charge the whole amount of damages that had been inserted in the original petition under the head of prayer for general damages, and strike out the prayer for special damages. The facts stated in the two petitions were identical, and it was perfectly competent for the court to permit the amendment. The same evidence would have necessarily supported either petition. It was an amendment and not a change of the

cause of action, nor a substitution of a new cause of action. No possible harm could have resulted to the defendant by the amendment, and none in fact did result. We think there is no merit in this contention.

II. The circuit court in its instruction number one for the plaintiff directed the jury that, if they found and believed from the evidence that at the point where plaintiff was struck, run over and injured, if you find from the evidence that he was struck, run over and injured, said track was clear and unobstructed, and sufficiently straight to permit a view along the track from an approaching train; and if the jury further believe that, at the point where plaintiff was struck by the engine and cars, the roadbed of defendant, both northeast and southwest of said point, was, at the time, used and had for a long period of time prior thereto been used with the knowledge of the defendant, its servants, agents and employees, by pedestrians as a footpath leading to and from the village of Steele, then it was the duty of the defendant's employees in charge of and operating its engine and train of cars, when approaching said portion of defendant's roadbed, as was used as aforesaid as a passway, to keep a lookout for persons and to ascertain that said track was clear, and if they found from the evidence that at the time the engine and cars reached said portion of track that was used as aforesaid as a passway, that it was in the nighttime, and that the night was a dark one, then it was the duty of the defendant's employees in charge of said engine and cars to use ordinary care to provide a means to see and observe whether or not said track was clear, and if the jury found that the defendant's employees in charge of said engine and cars recklessly, negligently and carelessly failed to perform their duties in this respect, and by reason thereof plaintiff

was struck and injured by defendant's engine and train of cars, and that plaintiff himself was reasonably careful to avoid such injury, then they should find for the plaintiff in such sum as they might find from the evidence he was entitled to, not to exceed eighteen thousand dollars.

The jury were further instructed that although they might believe from the evidence that plaintiff was a trespasser upon defendant's track at the time he was struck and injured, if they further find and believe from the evidence that the engineer or fireman in charge of said engine which struck and injured plaintiff, by the use of ordinary care could have seen plaintiff and the perilous position in which he was placed, and that plaintiff was unaware of his peril, and was proceeding along the track unconscious of the approaching train, then it was the duty of the engineer to use ordinary care with the means at hand to have avoided the injury to plaintiff. But if they find the defendant, by its said servants, failed to use such ordinary care and plaintiff was injured, they would find for the plaintiff.

The court defined ordinary care to be such care as an ordinary, careful and prudent person would exercise under the same or similar circumstances.

The court also instructed the jury that if they believe from the evidence that plaintiff immediately before the accident came upon the railroad track of the defendant at the point on said track, which had been prior to and was at the time of the accident, used by the public with the knowledge and tacit consent of the defendant, as a footpath, and that before stepping upon the said track, he listened and looked south for an approaching engine, and could not and did not see the approach of the train; that it was in the nighttime, and the night was dark, and the headlight on the engine was not burning or lighted, and by the reason of the negligence of the defendant

in failing to have said light burning, plaintiff was unable to see the approaching train, and by reason of such negligence he was injured, they should find for the plaintiff.

For the defendant the court instructed the jury that it was the duty of the plaintiff while on the track of the defendant railroad to look and listen both ways for the approach of the train, and if at any time, before he was injured, while he was on the defendant's track, he could either by looking or by listening have seen or known of the approach of the train in time to have avoided the accident complained of, then he could not recover. And although they might find from the evidence that persons were in the habit of walking on the railroad track from time to time where the plaintiff was injured, and that defendant knew it, yet, unless they further find that its track at this place was habitually so used, and that it knew it, or by the exercise of ordinary care might have known it, then the defendant's servants in charge of the train owed no duty to keep a lookout at that place for persons on the track, and it was not liable in that case for the injuries received by the plaintiff, unless its servants in charge of the engine and train which injured him saw or knew that he was in a dangerous position, or by the exercise of ordinary care could have known his dangerous position on the track in time to have stopped the train and avoided injuring him and failed to do so.

It is insisted by the defendant that the evidence did not justify the submission of the case to the jury, for that, the plaintiff went upon the defendant's railroad track about midnight upon a dark night, after having heard the train before he did so, and at a time of night when the defendant and employees under the facts in the case were not required to antici-

220 Sup—20

pate the presence of any one on the track at the point of the accident, and because he had heard the train whistle, and took no precaution to protect himself from the injury. As already stated, the evidence disclosed that when the plaintiff went upon the track, he stopped, looked and listened to learn whether a train was approaching. He testified that he heard a whistle sounded south of the village and he turned and looked in the direction from whence the sound came. It was a dark night, and he could see nothing approaching, and he concluded the whistle was that of a gin, which was located near the track, and he then turned and started north up the track and had gone about fifty feet when the engine struck him. The evidence of other witnesses also was to the effect that they heard a whistle down about the south limits of the village, but that they also thought it was the gin whistle. Under these circumstances, it was a question for the jury to determine whether the plaintiff knew of the approach of the train by reason of the sounding of the whistle and whether he did not honestly believe it was the gin whistle instead of the whistle of an engine, when taken in connection with his evidence that immediately upon hearing it, he stopped and listened and looked in the direction from which the train came, and could not see the train, and in connection also with the testimony of the witnesses that the bell was not rung upon the engine, and the testimony that there was no head-light lighted and burning in front of the engine at the time. We do not think the court could have assumed under the evidence that the plaintiff knew the train was approaching him upon the track when he started to walk north thereon.

As to the other proposition included in this contention, to-wit, that the employees of the defendant in charge of its engine and train that night were not required to anticipate the presence of any one on the track at the point of the injury, the court took

the view announced by this court in Eppstein v. Railroad, 197 Mo. 1. c. 734, that the evidence made a case in which the use by the public of the track at this place was of that sort that it became a mixed question of law and fact whether those running the locomotive engine had reason to anticipate the presence of people and pedestrians on the track, and that in such case, the issue should have been submitted to the jury to be. determined by them.· The place where the plaintiff was injured was about one hundred feet from the depot or station of the defendant, within the corporate limits of the village of Steele. The evidence tended to show that ever since the construction of the roadbed and tracks of the defendant through this town, it had been used by pedestrians as a walkway. It was used by all the employees of the several large mills north of Steele in going to and from their work, both in the day and the nighttime, as well as by other persons residing in and near the town, and that this fact was well known to the agent of the defendant in charge of its station at said town, and that no objection had ever been made thereto, either verbally, or by posting notices to persons to keep off the track. The right of way was not fenced, nor was there any inclosure of any kind along the right of way within. the corporate limits.

In Fearons v. Railroad, 180 Mo. 1. c. 223, this court, speaking through Fox, J., said: "But, again, if it is at a point where there is reasonable ground for expecting or anticipating the presence of persons, the presumption of a clear track is destroyed, and even though the persons be trespassers, it does not relieve those in charge of the moving cars from keeping a careful lookout for the persons so expected to be present at that point. There was sufficient testimony in this cause, at least, tending to show a state of facts, in respect to the use of this tunnel as a foot passageway from one section of the city to another, as would authorize the submission of the case to the jury." All

the pertinent cases upon this point were reviewed by this court in Everett v. Railroad, 214 Mo. 54, and the rule announced in Eppstein v. Railroad, and Fearons v. Railroad, supra, were approved. These cases announced no new principle but followed a rule that had been recognized for many years in this State prior to their promulgation.

In this case the first essential inquiry must be to ascertain and determine what were the duties of the defendant's engineer and fireman in charge of the engine and train that night and at the place where plaintiff was struck, and how, if at all, they failed to discharge those duties, for unless the law cast upon them a duty to plaintiff there could be no negligence. In this and all similar cases, the defendant insists it owed no duty whatever to plaintiff save that of not wantonly and recklessly injuring him after the engineer or fireman actually saw the peril to which plaintiff was exposed and as they did not see him until after he was struck, there was no liability. As a necessary corollary of this presumption defendant insists that it was under no obligation to ring its bell or blow the whistle on its said engine, and that its failure to have a headlight lighted and burning on the engine was not an omission of duty of which the plaintiff can complain in the circumstances.

Conceding that a railroad track upon which engines and trains are run is necessarily and obviously a place of danger for pedestrians, and that ordinarily he is a trespasser and guilty of negligence *per se* in walking upon the track, yet a long line of decisions by this court has determined that cases may and do arise where, though the company is entitled to a clear track, it cannot fairly be presumed that the track is clear, and the duty then arises to look out, and the liability is not limited to want of care after discovery of the danger. [Williams v. Railroad, 96 Mo. l. c. 281.]

This court, through VALLIANT, J., in Morgan v.
Railroad, 159 Mo. 1. c. 279, commenting upon the stat-
ute of this State, which prohibits anyone not connect-
ed with or employed upon the railroad, from walking
upon the tracks thereof, and providing that in case
such person receives harm on account of so doing, he
shall be deemed to have committed a trespass in so
walking upon the track, in any action brought on ac-
count of such harm, said: "Of course, usage and cus-
tom cannot repeal a statute, and it is not contended
here that it does. But usage and custom may change
the condition of a thing upon which the statute oper-
ates; and by usage and custom a publicly-traveled
footpath may be in fact created within an otherwise
private inclosure, so that a person found walking upon
it would not be amenable as a trespasser." Now in
this case, the jury by their verdict found that the track
of the defendant at the town of Steele, where the plain-
tiff was injured, was habitually used by persons as a
passway leading to and from the village of Steele, and
that the defendant knew that such was the custom and
usage, and accordingly, under the authorities above
cited, it was the duty of the defendant's servants in
charge of this train that night to keep a lookout at
that place for persons on the track, and if its engi-
neer saw or knew that plaintiff was in a dangerous
position, or by the exercise of ordinary care could
have known his dangerous position on the track at
the time, in time to have stopped the train, and avoid-
ed injuring him, and failed to do so, then defendant
is liable. So that, responding to the contention of the
defendant that it owed plaintiff no duty whatever to
look out for him at this place, under the evidence in
this case, it must be held that its position is not tena-
ble, and that the court properly declined to give an
instruction that the defendant owed the plaintiff no
duty to be on the lookout for him at the time he was
injured. Again, as the evidence tended to prove that

·this was a place where the engineer should have antici-
pated the presence of persons on the track, and the
jury so found, one of the most ordinary precautions
which ordinary care would have dictated would have
been the ringing of the bell and seeing to it that the
headlight on the engine was lighted and kept burning.
The defendant insists, however, that the absence of
the headlight on the locomotive was not, under the facts
of this case, the omission of a duty of which plaintiff
can complain; that the purpose of the headlight was
to give warning to those who had occasion to cross
the tracks at streets and public highways, and it was
not for the benefit of trespassers walking along the
track, and was also for the protection of passengers on
its trains, and in support of this contention defendant
relies upon the case of Frye v. Railroad, 200 Mo. l. c.
401.    But it seems to us that the most casual reading
will differentiate the facts of that case from those of
this case.    In that case the right of way was fenced
and notices and signs of warning to the public against
the use of the track were maintained.    There were also
wing fences and cattle-guards.    Whereas in this case
the track lay through the village of Steele with houses
and mills upon either side thereof.    The track had
never been fenced, there were no signs or notices to
the public to keep off the track, and the evidence was
that from the time of the construction of this railroad
through the town this track had been used as a regular
passway, both day and night, and in a word, as found
by the jury, it had been habitually so used.    We have
no hesitancy in saying we think the Frye case was
properly decided, but we think this case is entirely
unlike it in its facts, in so far as the use of this track
as a passway is concerned.    In our opinion, the court's
instructions for the plaintiff and the defendant upon
this question was a fair statement of the law
as to the respective rights of the plaintiff and the de-
fendant, at the time the plaintiff was injured, and

were as favorable to the defendant as it could ask under the law of this State. To say that the defendant was in duty-bound to keep a watch out for persons on the track at this point, and yet to say that it might run its trains on a dark night over this point without any headlight on its engine, would be a contradiction, and therefore the court committed no error in refusing instructions numbered five and seven asked by the defendant, which announced the proposition that if the jury found from the evidence that the defendant's servants in charge of the engine were unable to discover plaintiff on the track in time to have avoided injuring him on account of having no headlight on the engine, then they would find for the defendant.

III. As to the refusal of the instruction numbered six, to the effect that the defendant was guilty of no negligence in running its engine and train at the rate of speed shown by the testimony, or at any rate of speed, it is sufficient to say that no right of recovery whatever was based upon the charge that the train was being run too rapidly. While the instruction might have been well enough in a proper case, we think it had no place in this case. The court did not err in refusing it.

IV. Defendant complains of the modification by the court of its instruction number nine. As modified it was in these words, and numbered seven by the court: "The court further instructs you, that if you find from the evidence that plaintiff was injured while on the track of defendant's railroad, as alleged in the petition, and when he was so injured, he was intoxicated in any degree, and his intoxication was unknown to the defendant's servants in charge of the train, then his intoxication will not excuse the omission, on his part, of that same care and prudence which would have been required of a sober man, under the same circumstances and situation, to have exercised to protect

himself against injuries; and if you further find from the evidence, that by reason of his intoxication, he failed to exercise that care and caution a prudent and reasonable sober man, or a man not intoxicated to the extent he was, would have exercised in the same situation, and under the same circumstances; and further find from the evidence that had he exercised such care he would have avoided the injury, then he cannot recover in this action and your verdict must be for the defendant.'' We think the instruction as modified was a full and proper statement of the law and that the court committed no error in striking out the words contained in the instruction first requested by the defendant, to-wit: ''Even though you further find from the evidence that the defendant's employees in charge of the engine and train were negligent in managing the train in manner and form as alleged in the petition, and plaintiff was injured.''

V. The court committed no error in modifying instruction number eight as requested by the defendant and giving in lieu thereof instruction number five. The modification was required by the law defining the duty of the defendant's engineer and fireman as already herein announced. And for the same reason the court committed no error in refusing instructions 1, 2, 3 and 4, as they were all based upon the proposition that defendant's servants, under the facts of this case, were not required to exercise ordinary care to discover the plaintiff on the track at the place where he was injured.

VI. There was no error in permitting the plaintiff to prove over the objections of the defendant by the witnesses J. R. Jenkins, Roscoe Wall, W. T. Wall and his wife, that the locomotive had no headlight lighted and burning that night. The objection was that these witnesses did not see the locomotive immediately before it struck and injured the plaintiff, but

their testimony was to the effect that they saw it almost immediately afterwards, and this was competent evidence that at least would have thrown upon the defendant the burden of establishing that the light had gone out after the injury to the plaintiff, and before they saw the engine a few minutes afterwards. We think there is no merit whatever in this assignment.

We have carefully gone through the evidence in the case, and there was unquestionably plain and direct conflict in the testimony. On the part of the plaintiff the evidence tended to show that there was no headlight burning and no bell rung on the locomotive at the time the train ran over the plaintiff, whereas on the part of the defendant the testimony of the train crew and the engineer and the fireman was to the effect that the headlight was burning brightly. Under these circumstances, it clearly was the province of the jury to determine which evidence they believed, and it was their province to reconcile the evidence if they could.

There is this to be said in regard to the evidence on behalf of the plaintiff: if, as the testimony of the engineer and fireman indicates, the headlight would have thrown a light for at least one hundred feet in front of the engine, and the train was only running three miles an hour and could have been stopped in from six to twenty feet, it seems almost incredible that neither the fireman nor the engineer saw the plaintiff on the track as he clearly and evidently was at the time, whereas, if the plaintiff's testimony is true and the headlight was not burning, and there was no light there, then we can readily understand why the engineer and fireman did not see the plaintiff on the track, and this is by far the most charitable view to take of the evidence; but as we have said, the jury found that there was no headlight on the engine, and that the bell was not rung, and that the plaintiff was walking on a track which was habitually used by people of that

town and vicinity as a footway and a passway, and that before going upon the track or attempting to walk up it, he stopped, looked and listened and saw no train approaching, and while he heard a whistle, he was led to believe that it must have been a gin whistle because he could not discover any train on the track. The case, we think, was one largely of fact, and the credibility of witnesses, and the jury were properly instructed by the court, and with their verdict we are not authorized to interfere. The judgment is therefore affirmed.

*Burgess* and *Fox, JJ.,* concur.