RAYMOND WISE, an Infant, by ROLAND A. WISE, His Next Friend, v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, a Corporation, and L. C. MOORE, Appellants.—76 S. W. (2d) 118.

Division One, November 16, 1934.

*Jones, Hocker, Sullivan, Gladney & Reeder* and *Frank Y. Gladney* for appellants; *Luther Burns* of counsel.

1170

*Eagleton, Henwood & Waechter* for respondent.

ATWOOD, P. J.—Raymond Wise, an infant, by Roland A. Wise, his next friend, sued the Chicago, Rock Island & Pacific Railway Company, a corporation, and conductor Hugh Sanders and engineer L. C. Moore for damages on account of injuries alleged to have been inflicted on Raymond Wise by one of the railway company's trains. Defendant's answer was in the nature of a general denial. The action was thereafter dismissed as to defendant Sanders and the trial resulted in a verdict and judgment in favor of plaintiff and against both defendants for $15,000 from which judgment both defendants have appealed.

Plaintiff's case was submitted to the jury on the theory that, while he was attempting to walk across the track in front of an approaching train of the defendant railway company, he was struck and injured

by the engine of the train, and that defendant Moore, the engineer of the train, saw or by the exercise of ordinary care could have seen plaintiff approaching and in a position of imminent peril of being struck by the train, in time, by the exercise of ordinary care, to have avoided the collision and the resulting injuries to plaintiff by slackening the speed of the train and by sounding an audible warning, as more specifically set forth in instruction numbered 1 given at the request of plaintiff.

Appellants' first assignment of error is that the petition "is fatally defective in that it does not allege a use of the tracks (a) by the public, or (b) for purposes of travel, or (c) that it was definite, or (d) habitual, or (e) frequent, or (f) continuous, or (g) that the railroad company had either actual or imputed knowledge of such a public user."

The allegations in plaintiff's petition pertinent to this assignment are that at the time plaintiff was injured he "was at or near the tracks of defendant, Chicago, Rock Island & Pacific Railway Company, at a point just west of Goodfellow Avenue, an open and public street and highway in the city of St. Louis, Missouri, and plaintiff was crossing at a place where defendant knew or by the exercise of ordinary care would have known was used, at the time and long prior thereto, by persons crossing said tracks," etc. Such pleading of track user is obviously scant and defective, but not fatally so because defendants apparently did not challenge the sufficiency of these averments below and the case was tried as if they were sufficient. Consequently, the objections now urged by appellants do not predicate reversible error. [Frye v. Railway Co., 200 Mo. 377, 408, 98 S. W. 566.]

Counsel for appellants also say that there was no evidence that the trainmen actually saw plaintiff in a position of peril at any time, or that there was a public use of the tracks at the point in question such as to make it the duty of the engineer to be on the lookout for pedestrians on the tracks. Hence, they insist that instruction numbered 1, given at plaintiff's request, submitting both hypotheses was prejudicially erroneous. This instruction was as follows:

"The court instructs the jury that if you find and believe from the evidence that on the occasion in question, plaintiff was crossing the tracks at the place mentioned in evidence, and if you further find that the plaintiff was crossing said tracks at a place which defendants knew was used, at the time, and for a long time prior thereto, if you so find, by persons crossing said tracks, if you so find, and if you further find that the defendant, Chicago, Rock Island & Pacific Railway Company, through defendant, L. C. Moore, was in charge of and operating the train mentioned in evidence, over and along tracks, at the place aforementioned, and that said train did

1172

collide with and strike the plaintiff, and that as a direct result thereof, if you so find, the plaintiff was injured thereby, and if you further find, that at and prior to the time of the collision aforesaid, plaintiff was approaching and in a position of imminent peril of being collided with by said defendant's aforesaid train, and that said agent of defendant, Chicago, Rock Island & Pacific Railway Company, saw or by the exercise of ordinary care on the part of said agent could have seen the plaintiff approaching and in the aforesaid position of imminent peril, if you do so find, in time thereafter, by the exercise of ordinary care, and with the means and appliances at hand, and with reasonable safety to defendant's train and its occupants, to have sufficiently slackened the speed of said train, and to have sounded an audible warning signal, and that by so doing said defendant could thus and thereby have avoided the aforesaid collision, if you so find, and that said agent in charge of and operating said train, under the circumstances aforesaid, if you so find, did fail to sufficiently slacken the speed thereof, and to sound an audible warning signal, and that in thus failing, if you so find, said agent of defendant in charge of and operating said train was then and there negligent, and that plaintiff was injured as a direct and proximate result of the aforesaid negligence on the part of defendant (if you find defendant's agent, in charge of and operating said train, was guilty of negligence in failing to sufficiently slacken the speed of said train, and in failing to sound an audible warning signal, if you so find), then your verdict must be in favor of the plaintiff and against the defendants, and this is true even though you may find and believe from the evidence that the plaintiff himself was guilty of negligence in getting himself into the aforesaid position of imminent peril, if any.''

At the close of all the evidence counsel for defendants offered a demurrer to the evidence which was refused.

Viewing all the evidence in the light most favorable to plaintiff, as we must in ruling appellants' present objections thereto, it appears that on January 9, 1926, the day in question, freight trains of the defendant railway company were operated on two main line tracks extending east and west through the northwest section of the City of St. Louis, Missouri. Eastbound trains used the south track and westbound trains used the north track. Goodfellow Avenue, extending north and south, passed under a viaduct which was about fifteen feet above the surface of Goodfellow Avenue. A short distance west of the viaduct there was a cross-over track between the two main line tracks, and a short distance east of the viaduct there were several switch tracks both north and south of the two main line tracks. These switch tracks provided shipping facilities for various industries located along the north and south sides of the railroad right-of-way. There were residential sections north and south of

the viaduct on Goodfellow Avenue, and there was a residential sec-, tion beginning about two blocks northwest of the viaduct known as Pine Lawn.

Early in the afternoon of that day plaintiff, then thirteen years of age, and four other small boys, Ralph Rost, Roy Larkin, Arthur Larkin and Fred Lieber, hauled some apples and potatoes to a point on the west side of Goodfellow Avenue, near the lower southwest corner of the viaduct, in a "Post-Dispatch push wagon," used or-dinarily in hauling newspapers. They left the wagon at that point and walked along the pathway up the embankment west of the via- duct and south of the two main line railroad tracks, then across the tracks and along a pathway up the hill or embankment on the north side of the tracks, carrying the apples and potatoes to a point on that hill or embankment where they started a camp fire and began roasting them. It was thirty-two feet from the north rail of the north track to the bottom of that hill or embankment.

About three o'clock that afternoon, while they were still enjoy-ing the camp fire and feast, they saw another group of boys approach-ing a viaduct from the south on Goodfellow Avenue, and plaintiff and his companions started to walk down the hill or embankment north of the tracks across the tracks, and down to a point on the embankment south of the tracks where they could guard against any interference with the push wagon by the other group of boys. As they went down the hill or embankment north of the tracks and across the tracks, they were "strung out" in single file, "because that is the way" they "had to come down the path." Ralph Rost was in the lead, with Roy Larkin next, Arthur Larkin next, Fred Lieber next, and plaintiff last. The first four boys were seven to fifteen feet apart, and plaintiff was about fifteen feet behind Fred Lieber who was the fourth boy in line. As the first three boys started across the tracks they saw a westbound freight train on the north track approaching from the east. Ralph Rost, the first boy to cross the tracks, said the train was "around two hundred yards" away when he first saw it. Fred Lieber, the fourth boy to cross the tracks, was pro-duced as a witness by defendants and testified that he first saw the train just after he crossed the tracks and it was then "about a hundred yards" away. Plaintiff testified that he did not know the train was ap-proaching until he saw it when he was midway between the rails of the north track, and that it was then "right within twelve feet" of him. He became excited, "started to go back"—north—"slipped and fell," was struck by the "front part" of the engine—the part "sticking out to the front"—and the engine ran over his left leg and right foot, necessitating amputation of his left leg above the knee and the great toe of his right foot. He was struck by the engine at a point twenty-five to fifty feet west of the west end of the via-duct. After he was struck "the train kept on going by," and he

"pulled" himself "away from the track" on the north side. His four companions stopped about half way down the embankment south of the tracks, when they saw the group of boys on Goodfellow Avenue were not going to disturb the push wagon, and a part of the train had passed when they got back up to the top of the embankment south of the tracks. They did not know that plaintiff had been injured until they looked under the moving train and saw him lying on the ground, north of the tracks, and heard him say his legs were "cut off."

The train consisted of an engine, forty-five cars and a caboose. It was operated by defendant railway company and defendant Moore was the engineer. The train was running at the rate of twenty-five to thirty miles an hour and its speed was not slackened at any time as it approached the place where plaintiff was injured. There was evidence tending to show that the engine whistle was not sounded, the bell was not ringing, and no warning signal of the train's approach was given. Engineer Moore testified that it was a "clear day;" that he had a good view of the viaduct and the track west of the viaduct for a distance of 200 yards as the train approached the viaduct from the east; that he was looking "out of the front window, straight ahead, looking, watching, straight ahead," all the way from the time the train left the yards at Carrie Avenue until after he passed the hill or embankment at the southwest corner of the viaduct, "between three and a half and five miles;" and that he could have stopped the train, "in an emergency," in about 150 feet. He also testified that he had been on that particular run "ever since 1910," and that "in going along there prior to that time" he had seen "people crossing around there about Goodfellow," and "men walking along the track," and a few "boys over in that lot along the northwest corner of the viaduct," and occasionally "boys in that swimming hole there." The fireman and head brakeman testified that they saw three or four small boys on the south side of the tracks, near the west end of the viaduct, as the train passed that point.

Plaintiff's witness Thomas M. Smith, Jr., who had a long and familiar acquaintance with the viaduct and its surroundings, testified: "Anyone that knows this bridge out there or knows anything about that neighborhood can come along there any day at the viaduct, and you can see people walking up on the south side of the viaduct almost every day. . . . On the south side of the viaduct, that is before we went to the dump, there is a walk there that they walk up. . . . They come along this way and turn to the right, and that up there is the pathway that people would walk on going up there" (indicating on a photograph marked Plaintiff's Exhibit A).

Plaintiff's witness Roy Larkin, a frequent visitor at the viaduct, testified that prior to the time plaintiff was injured he had observed persons walking along the track down near Goodfellow, also persons

walking up to the viaduct and on the southwest corner, and that prior to that day he had "noticed fellows from the foundry there went up that path" at the southwest corner of the viaduct, and had seen "people walk up the path south of the viaduct."

Plaintiff testified that he had several times visited the swimming hole "half a block, or so" west of Goodfellow and about "half that distance" south of the tracks, "several times," that he had visited the viaduct and the surrounding neighborhood on other occasions prior to the time he was injured, and that on those occasions he saw boys using the path on the embankment at the southwest corner of the viaduct and walking alongside the tracks in going to and from the swimming hole, and saw other persons using that track. He further testified: "Every time I went up there I seen people using them (the tracks) continuously."

A written statement signed by plaintiff's witness Roy Larkin prior to the trial was received in evidence on the offer of defendants in which he said: "As I recall it, there was a path across the tracks near where the accident happened, as boys would cross there to play on the north side of the tracks." Likewise, a written statement signed by plaintiff's witness Arthur Larkin was received in evidence in which he said: "There was a path up the embankment from the south side of the bridge to the track level and also a path up the embankment on the north side of the tracks where we had our potatoes."

It is true, as pointed out by counsel for appellants, that much of the above evidence as to public use of the railway tracks and right of way relates to portions other than that used by plaintiff and his companions at the exact time he was injured, and the assertions appearing in the written statements of the Larkin boys that a path extended from the south side of the viaduct and across the tracks and up the embankment on the north side were not closely related to the other matters therein urged by defendants as impeaching evidence. However, apart from these written statements and the uncontradicted oral testimony that many persons were frequently seen walking along the pathway leading up from the southwest corner of the viaduct to defendant railway company's tracks and upon its tracks and right of way immediately west of the viaduct, there was evidence that "fellows from the foundry there went up that path," that "people walk up that path," that a residential section known as Pine Lawn commenced about two blocks northwest of the viaduct, and photographs of the scene of the injury introduced in evidence by plaintiff and defendants show a well-defined footpath apparently discernible from a distance extending north from the tracks, near the west end of the viaduct and opposite the pathway extending south from the tracks to the southwest corner of the viaduct, up the hill or embankment upon which plaintiff and his companions had built their

fire, and it fairly appears from the evidence that this is the footpath they were using at the time plaintiff was injured.

As said in Frick v. Railway Company, 75 Mo. 595, 602, "the presence of that path was itself a warning to the servants of the company that persons were in the habit of trespassing upon the track at that point." Though scattered and meager we think, on the whole, there was sufficient evidence of use by the public of the track at this place to go to the jury on the question of whether or not defendants had reason to anticipate the presence of pedestrians at the time and place in question. [Cotner v. Railroad Company, 220 Mo. 284, 307, 119 S. W. 610; Eppstein v. Missouri Pacific Ry. Co., 197 Mo. 720, 734, 94 S. W. 967.] If defendants thus had reason to anticipate the presence of pedestrians on the track at this point it was their duty, as said in Ahnefeld v. Wabash Railway Co., 212 Mo. 280, 300, 111 S. W. 95, "to keep a lookout for the presence of such persons, and to use ordinary care and caution in avoiding any injury to them." Therefore, when defendant engineer testified as above stated, the jury might infer therefrom that he saw plaintiff in time to have slackened the speed of the train and sounded an audible warning before striking him, that the engineer failed to exercise these precautions and that his failure so to do was negligence. [Eppstein v. Missouri Pacific Ry. Co., 197 Mo. 720, 728, 729, 94 S. W. 967.] It appears that defendants' demurrer to the evidence was properly refused.

Counsel for appellants also insist that the facts as to public use of the track at the place where plaintiff was injured, hypothesized in Instruction No. 1, were insufficient. The instruction is by no means a model in this respect but upon the whole record it does not appear that the jury could have been misled thereby to defendants' prejudice. Consequently, we decline to hold that the trial court committed reversible error in giving it.

It is finally urged in appellants' behalf that their demurrer to the evidence should have been sustained because "plaintiff's uncorroborated version of how the accident happened is in direct conflict with the physical facts indisputably established by other witnesses for the plaintiff." In support of this contention appellants' counsel conclude from certain estimates appearing in evidence offered in plaintiff's behalf, of the distances between plaintiff and his several companions as they crossed the tracks, the speed of the approaching train and the distance it was from the point of injury when first observed, that the train was at least 160 feet east of the point of injury when plaintiff would have cleared the tracks to the south. The undisputed evidence is that plaintiff never crossed the tracks on his way south and was found in his injured condition just north of the tracks. We find no evidence as to how fast the boys were walking down the hillside and across the tracks and plaintiff tes-

tified that when he saw the train he was between the tracks, thought he could not make it across to the south then turned north and slipped and fell in front of the engine. The testimony of the witnesses as to distances and speed were at best merely estimates the accuracy or inaccuracy of which might well be argued to the jury but they are hardly susceptible of an interpretation that would justify taking the case from the jury. Defendants fully presented their theory that plaintiff ran or slipped down the north embankment and in that manner "collided" with the passing train, but its plausibility was rejected by the jury. We cannot say that plaintiff's testimony was so at variance with fixed physical facts in evidence that defendants' demurrers to the evidence should have been sustained.

For the reasons above stated the judgment is affirmed. All concur.